347 So.2d 59 (1977)
Victor L. QUICK, Individually and as Administrator of the Estate of the Minor, Andrea LaVaughn Quick, Plaintiff-Appellant,
v.
AETNA CASUALTY & SURETY COMPANY et al., Defendants-Appellees.
No. 13251.
Court of Appeal of Louisiana, Second Circuit.
May 23, 1977.
Rehearing Denied June 22, 1977.
*60 Nolan, Alderson & Jones, El Dorado, Ark., Richard R. Storms by Richard R. Storms, Ruston, for plaintiff-appellant.
Mayer, Smith & Roberts by Charles L. Mayer, Cook, Clark, Egan, Yancey & King by Sidney E. Cook, Lunn, Irion, Switzer, Johnson & Salley by Val Irion, Shreveport, for defendants-appellees.
Before BOLIN, PRICE and HALL, JJ.
En Banc. Rehearing Denied June 22, 1977.
BOLIN, Judge.
Victor L. Quick, individually and as administrator of his minor child, Andrea, brought this malpractice suit against Doctors' Hospital, various doctors and nurses, and their insurers for Andrea's blindness allegedly caused by the improper administration of oxygen to the child while she was in an incubator in the hospital. The lower court sustained a plea of prescription of one year and plaintiff appeals. We affirm.
More than one year having elapsed from the date of the alleged tort until this suit was filed, the question is whether or not the plaintiff had actual or constructive knowledge of the possible misconduct of defendants more than one year prior to the filing of this suit.
Plaintiff's wife gave premature birth to her daughter on April 8, 1973. The baby was immediately placed in an incubator and given oxygen. Shortly after the baby was released from the hospital she developed a problem with a closed tear duct. In September 1973 she was referred by a pediatrician to Dr. Rucker, an ophthalmologist. Dr. Rucker informed plaintiff and his wife that the child had a serious vision problem. He told the parents that the child, in his opinion, had retrolental fibroplasia (RLF), a condition characterized by the formation of scar tissue on the retina. He stated that the problem was oxygen related in that the eyes of a premature child, being extremely sensitive, may be damaged by being exposed to oxygen in an incubator.
After several consultations with Dr. Rucker, Andrea was referred to Dr. Roy, a pediatric ophthalmologist. Dr. Roy examined the baby in January, March, June and December of 1974 and he diagnosed the condition as RLF. He said he told the parents the possible causes of the condition, one of which was oxygen related. Dr. Roy considered the child to be blind and referred plaintiff and his wife to an organization which provided services for the blind. In connection with these services, in February of 1974 plaintiff's wife was furnished with a pamphlet which dealt with various aspects of RLF. In part the pamphlet stated:
In 1940, a new cause of blindness appeared as a significant factor for the first time among premature infantsa condition called retrolental fibroplasia (RLF), *61 fibrous tissue behind the lens of the eye. That year, only 200 cases were reported; but for the next 15 years, while a great deal of medical detective work was going on, hundreds of new RLF babies were reported annually. Then in 1954 research confirmed that RLF was not caused directly by an infant's prematurity, or by prenatal factors, but rather by the high concentration of oxygen that was being administered routinely to premature babies.

Many premature infants, especially "blue babies", must be given oxygen to survive. But investigation indicated that careful administration is required to give just enoughbut not too muchoxygen and that too many babies were getting oxygen as a precaution. Until these studies revealed the dangers, there seemed no harm in this routine. (Emphasis added)
Plaintiff's wife testified that she received the pamphlet but that it did not "have much of an impression" on her. However, she admitted that she testified earlier in a deposition that she read the pamphlet and that it stated RLF was oxygen related.
On August 8, 1974 an article appeared in the Stroller section of the Shreveport Times relating to Sharon Geddes who suffered from RLF and who was a former high school classmate of plaintiff's wife. This article stated:
* * * * * *
Miss Geddes lost her sight as an infant when pure oxygen was used to help her breathe due to a respiratory ailment. Pure oxygen damages the blood vessels in the eyes of infants and medical doctors now use a mixture of oxygen and other gases to avoid such damage.
Plaintiff's wife testified that several months before reading the newspaper article she visited in the Geddes home in order to discuss the problem with Sharon's mother. While she denied being told that Sharon's condition was caused by the improper use of oxygen, she admitted she did know that Sharon's condition was RLF and that it was oxygen related.
Plaintiff's counsel admit in their brief that plaintiff and his wife knew from the first visit to Dr. Rucker in September 1973 that RLF was caused by oxygen administered to their baby in an incubator. However, they contend that until they read the newspaper article on August 8, 1974 they had no way of knowing that the administering of pure oxygen to their child in the incubator was the possible cause of the RLF. Suit being filed less than one year following the reading of this article, it is thus contended that one year prescriptive period had not run.
In tort cases prescription generally does not commence to run until the injured party has actual or constructive knowledge of the tortious act, the damage, and the causal relation between the tortious act and the damage. Duhon v. Saloom, 323 So.2d 202 (La.App. 3d Cir., 1975), and cases cited therein.
In Cartwright v. Chrysler Corporation, 255 La. 598, 232 So.2d 285 (1970), the court stated constructive knowledge to be:
". . . whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry, is sufficient to start the running of prescription."
Plaintiff's child was not suffering from an unknown or mysterious disease. To the contrary the parents were told the name and nature of the disease almost two years before suit was filed. Knowing this, it was their duty to make inquiry as to the exact cause of the disease, and this they failed to do. It may be admirable for them to be more interested in seeking a cure for their child than seeking the basis for a lawsuit, nevertheless that is their duty if a suit is to be timely filed.
We conclude plaintiff and his wife were aware of the contents of the pamphlet furnished them by an association for the blind. This pamphlet stated the exact cause of *62 RLF as plainly as the article in the Shreveport newspaper. It is also significant that plaintiff's wife visited the Geddeses more than a year before this suit was filed. While Mrs. Quick denied discussing with Mrs. Geddes the precise cause of RLF, this is difficult to believe. If she did not discuss this she is charged with the knowledge which she might have learned had she discussed it. At that time she had enough information about her child's condition to arouse her curiosity as to its cause and she had every opportunity to ascertain this cause by simply asking her friend, Mrs. Geddes.
Considering the totality of the evidence, we find plaintiff had constructive knowledge of the alleged tort more than a year before suit was filed. Accordingly the judgment sustaining the plea of prescription is affirmed at appellant's cost.