381 So.2d 545 (1980)
Elzie HEBERT, Plaintiff-Appellant,
v.
CONFEDERATE MEMORIAL MEDICAL CENTER et al., Defendants-Appellees.
No. 14043.
Court of Appeal of Louisiana, Second Circuit.
February 25, 1980.
Rehearing Denied April 3, 1980.
Bruscato & Loomis by Anthony J. Bruscato, Monroe, for plaintiff-appellant.
William M. Cady, Asst. Atty. Gen., Shreveport, for defendants-appellees.
Before PRICE, JONES and McCLENDON, JJ.
En Banc. Rehearing Denied April 3, 1980.
JONES, Judge.
In this medical malpractice action against Louisiana Health & Human Resources Administration, plaintiff, Elzie Hebert, appeals the dismissal of his suit by the sustaining of an exception of prescription. We find the exception of prescription has no merit and reverse the judgment.
Plaintiff entered Confederate Memorial Hospital in Shreveport on August 23, 1971 to undergo a laminectomy. On August 31st, five days after the low back surgery was performed at the L-4 and L-5 level, an orderly employed by Confederate gave plaintiff an enema which caused plaintiff great pain. Evidence tends to establish that the enema device was not injected into the body in the proper place, but rather was forced into the area alongside the rectal canal. Plaintiff's problem of pain in his *546 abdomen and rectum was first diagnosed as a paralytic ileus caused as a result of the anesthesia given at the time of the disc operation. When plaintiff's wife examined him, she found patches of what appeared to be dried black blood in the area, and she then asked that a doctor examine him. When Dr. Charles Byrd examined plaintiff on September 4, 1971 he was horrified to find air in the tissues of the rectum. He immediately had a proctoscopic examination performed upon plaintiff which revealed that the lower wall of the rectal area was black in color and necrotic in composition. The gangrene in the rectum created a life-threatening situation because of the dangers of the massive abscesses and the resulting sepsis, a rapidly spreading bloodstream infection. Plaintiff mentioned the enema to Dr. Byrd, but Dr. Byrd did not associate the painful enema with plaintiff's rectal problem. Dr. Byrd was puzzled as to the cause of this condition because he did not know how the infection in the rectal area was related to the laminectomy. Dr. Byrd consulted with a staff physician of the hospital, and it was decided to immediately perform a loop colostomy which would prevent bowel movements in this area.
At the time the loop colostomy was performed an attempt was made to remove as much of the necrotic tissue in the rectal area as possible. Plaintiff later underwent another operation for removal of more of the necrotic tissue. These two surgeries failed to heal and repair the grossly infected rectum, and it became necessary on September 23rd to perform a total colostomy which permanently removed plaintiff's colon. Plaintiff was discharged from Confederate on October 15, 1971.
Plaintiff testified he was unaware of the reason for the colostomy, but he thought the cause of his colostomy may have been cancer because his family physician, Dr. Tugwell, told him, after his discharge from the hospital, that malignancies of the colon were usually the reason for colostomies. Plaintiff first became aware that the colostomy was caused by the enema in February, 1974 when he went to Confederate for a check-up. While there he overheard two doctors discussing the cause of his colostomy as being an enema. After having overheard this conversation, plaintiff secured all of his medical records from Confederate and instituted this suit on December 31, 1974.
The trial judge stressed in his reasons for judgment, wherein he found plaintiff had constructive knowledge of his malpractice action more than one year before the suit was filed, the following notation from the emergency operation report wherein the loop colostomy was performed on September 5, 1971:
"Approximately 1½ weeks post-op the patient noted after receiving an enema severe pain in the rectal area."
The trial court concluded:
"The court holds that plaintiff had the notice required by law to begin the running of prescription and he had this notice from the time the enema was administered combined with the date of the emergency surgery Sept. 5, 1971."
A review of plaintiff's operation report of September 5, 1971 reflects that the full context of the section of the report from which the trial court obtained the quoted language reads as follows:
"49 year old white male admitted to the Orthopedic Service and underwent surgery on his lower back. Approximately 1½ weeks post op the patient noted after receiving an enema severe pain in the rectal area. He was found to have a necrotic area on the left anal wall and at proctoscopy, the necrosis extended up the rectum involving the left wall to approximately 11 cms. It was felt the patient should have a diverting colostomy with excision and drainage of the necrotic anal and rectal tissue."
We do not construe this language as stating that Dr. Bagley, who signed the operating report, was diagnosing the cause of the gangrene in plaintiff's rectum as being the enema. Dr. Byrd, who assisted in the operation, performed the initial examination when the gangrene was discovered in plaintiff's rectum. He testified he was told of *547 the enema but did not relate the enema to the gross infection which required the emergency surgery. Of further significance with regard to evaluating the language of the operation report of September 5 is the following statement contained on the operation report of September 23rd when the total colostomy was performed:
"49 year old white male who developed gangrene of the rectum of unknown etiology and had extensive debridement. He was presented to the staff and it was recommended that he have abdominoperineal resection since this area could never be adequately reconstructed and repaired. He also had a diverting colostomy done previously."
This report was signed by Dr. Johnson, but the report reflects that Drs. Bagley and Williamson assisted him in the performance of the colostomy. It would seem that if Dr. Bagley had related the gangrene of the rectum to the enema that at the time this operation was performed he would have related this information to Dr. Johnson and it would have been incorporated in the report as the cause of the gangrene, rather than the statement that the gangrene was of "unknown etiology". Dr. Williamson, who had assisted in this surgery, examined plaintiff in the out-patient clinic on January 8, 1972, and in his description of this examination referred to the colostomy as being required by "gangrene of the rectum beyond repair secondary to an unknown infection".
These observations establish that at least Drs. Byrd, Johnson and Williamson did not relate plaintiff's enema to the cause of the gangrene which required the colostomy. Though Dr. Bagley had alluded to the enema in the operation report signed by him on September 5th, this report contained no definitive statement by Dr. Bagley that he concluded the enema caused the gangrene.
Plaintiff's family physician, Dr. Tugwell of Bastrop, with the authority of plaintiff, sought plaintiff's medical records from Confederate having as one purpose of the request to determine the cause for the colostomy. Dr. Tugwell's request was dated June 30, 1972 and read as follows:
 "Elzie Hebert
Will you please send me the medical records on the above named patient. I am treating him now and need this information."
In response to this request Dr. Tugwell received a letter dated July 6, 1972 from Confederate stating:
"Elzie Hebert was admitted to this hospital 8-23-71 discharged 10-15-71 with final diagnosisHerniated Nucleus Pulposus; Gangrene of Rectum; Wound Infection. Operative procedure; Laminectomy; Abdomino-perineal Resection; Colostomy; Debridement of Necrotic tissue in rectum.
The patient was last seen in clinic on 5-15-72. A copy of the clinic notes is attached."
Dr. Tugwell testified that the words "wound infection" following the words "gangrene of rectum" and separated from these words by the semi-colon contained in Confederate's letter did not impart to him information that the gangrene of the rectum was related to any particular trauma, but rather he considered the wound infection could have related to the surgical wound created by the laminectomy or the colostomies. Dr. Tugwell's failure to construe the words "wound infection" as throwing up a red flag with regard to the cause of the gangrene in the rectum is supported by the information contained in the out-patient clinic reports which were attached to Confederate's July 6th letter. In these out-patient reports is Dr. Williamson's description of his examination of plaintiff on January 8, 1972 when he stated:
"4 months postop abdominal perineal resection because of gangrene of the rectum beyond repair, secondary to an unknown infection. Has done well, but returns today with complaints of pain around the colostomy and symptoms of pus draining from this area from time to time. Examination reveals no definite inflammation, no abscess, no drainage, and no evidence of infection. He has a *548 normal temperature. Darvon-N, Valium 5 mgs. t.i.d., and Achromycin 250 mgs. q.i.d. imperically has been prescribed with t.i.d. warm soaks in the tub, for physical therapy. Return in 1 week for follow up on this treatment.
 s/ Dr. Williamson/bg".
The trial judge in his reasons for judgment stressed that Dr. Tugwell, as plaintiff's private physician, upon obtaining the letter from Confederate dated July 6th stating plaintiff had gangrene of the rectum, should have pursued his investigation and sought further records from Confederate. The trial judge stated that if he had, he would have found the operating report of September 5th and would have found a statement made by Dr. Baskin in an out-patient clinic report regarding a visit plaintiff made on August 14, 1972, which related plaintiff's gangrene of the rectum as occurring "following complication from an enema".
The medical records on plaintiff's colostomy received by Dr. Tugwell were indeed scanty, but there was no reason for Dr. Tugwell to request additional information since he had been clearly told by Dr. Williamson's out-patient clinic report that the surgery was caused by the gangrene but that Confederate did not know the cause of the gangrene.
The only issue presented on appeal is whether plaintiff's suit, filed within less than one year of the time when he overheard the doctors' conversation in February 1974 to the effect that his colostomy was caused by an enema, was not timely filed because he either had actual or constructive knowledge that the enema was the cause of the infection of his rectum from other circumstances more than one year before he instituted this suit.
Prescription does not run until the party has actual or constructive knowledge of the tortious act, the damage, and the causal relationship between the tort and the damage. Knowledge of all three elements more than one year prior to the institution of the suit must be present in order for plaintiff's action to have prescribed. Duhon v. Saloom, 323 So.2d 202 (La.App.3d Cir. 1975), and cases cited therein. See also Quick v. Aetna Cas. & Sur. Co., 347 So.2d 59 (La.App.2d Cir. 1977).
The trial court relied upon the decision of Cartwright v. Chrysler Corp., 255 La. 598, 232 So.2d 285 (1970), and Quick, supra, as authority for sustaining defendant's plea of prescription. Cartwright, supra, involved a case where plaintiff, seeking damages as the result of injuries sustained when her car was struck from the rear by another car, sued the manufacturer of the car which caused her injuries and the company which serviced the car. She alleged their negligence in the manufacture and service of the braking system on the vehicle caused the accident and her resulting injuries. This suit was filed more than one year after the accident. Plaintiff had earlier sued within one year of the date of the accident the driver of the vehicle which caused her injuries, alleging the accident was due to his negligent operation of the car. Following the trial of this case, the court found that the accident was not caused by the negligence of the driver, but rather was unavoidable because of sudden brake failure. Plaintiff contended her second suit was timely filed because it was filed four days after the trial of the first suit when she for the first time learned the real cause of the accident was defective brake lines in the car which collided into the rear of her automobile. The evidence established that plaintiff was told at the scene of the accident by the driver of the car which collided with her that his brakes had failed. The Cartwright case held that this information provided notice enough to require that plaintiff make further inquiry as to the exact cause of the brake failure. The court recognized the principle that actual knowledge is not required, but constructive notice exists when plaintiff acquired sufficient knowledge to "call for inquiry" and when these circumstances exist, the running of prescription commences at the time constructive notice is acquired. The court was here saying that when plaintiff acquired the knowledge at the scene of the accident that the car ran *549 into the rear of her automobile because of brake failure, she was not required to know what part of the braking system failed or the exact cause of the failure before prescription commenced to run. The court sustained the plea of prescription.
In Quick, supra, plaintiff instituted a malpractice action based upon the blindness caused a premature baby by placing her in an incubator containing excessive oxygen. The baby was born April 8, 1973, and in September, 1973, plaintiff was told by an opthamologist:
"... the problem was oxygen related in that the eyes of a premature child, being extremely sensitive, may be damaged by being exposed to oxygen in an incubator." Id. at 60.
In February 1974 plaintiff was given a pamphlet by an Association for the Blind which contained the following information:
"Then in 1954 research confirmed that RLF [a form of blindness] was not caused directly by an infant's prematurity, or by prenatal factors, but rather by the high concentration of oxygen that was being administered routinely to premature babies.
Many premature infants, especially `blue babies', must be given oxygen to survive. But investigation indicated that careful administration is required to give just enoughbut not too muchoxygen and that too many babies were getting oxygen as a precaution." Id. at 61.
The court cited Cartwright, supra, and quoted the following language from it:
"... whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry, is sufficient to start the running of prescription." Id. at 61.
The suit filed by plaintiff more than one year following receipt of the pamphlet containing the quoted information had prescribed because from the information contained in the pamphlet there existed sufficient information to arouse curiosity that the cause of the baby's blindness was connected with the administration of the oxygen in the incubator. Under these circumstances plaintiff had constructive knowledge of the alleged tort more than one year before the suit was filed. The Cartwright case where plaintiff was told on the day of the accident that it was caused by brake failure, a circumstance which would raise a red flag on the entire braking system to any auto driver, and the Quick case where plaintiff received in black and white a writing telling him that the baby's blindness could be caused by too much oxygen in an incubator are totally factually dissimilar from those reflected by the recitation of the facts surrounding plaintiff's colostomy. These cases are not authority for holding plaintiff had constructive knowledge of the relation between the enema and his colostomy, where evidence established that at least three physicians did not relate the forceful enema [tort] to the colostomy [damage].
In Henson v. St. Paul Fire & Marine Ins. Co., 363 So.2d 711 (La.1978), the supreme court made the following statement with regard to constructive knowledge:
"Basically, prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring suit, as long as such ignorance is not willful and does not result from his neglect." Id. at 713.
The supreme court in the late case of Young v. Clement, 367 So.2d 828 (La.1979), made the identical statement:
"Prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring a malpractice action, as long as such ignorance is not willful and does not result from his neglect." Id. at 830.
In this case plaintiff's malpractice action was based upon blockage of a ureter by the surgeon's negligent stitching at the time he performed an operation on January 26, 1973 removing plaintiff-wife's ovaries and fallopian tubes. Plaintiffs' suit also alleged that the tubes and ovaries were healthy and their removal was unwarranted. The ureter *550 blockage was relieved by corrective surgery performed on February 1, 1973 by a surgeon other than the defendant in the suit, and this surgeon advised plaintiff that her pain was caused by a blockage of the ureter. In July, 1975, plaintiffs asked the surgeon who had removed the blockage of the ureter what had caused the blockage. They were prompted to inquire of the reason for the blockage because of rumors about the reason for the doctor's, who had performed the initial surgery, departure from Lake Charles. Plaintiffs were told by the physician who had corrected the blockage of the ureter that it was caused by a misplaced stitch during the removal of her tubes and ovaries. Plaintiffs instituted their suit within less than one year of acquiring this knowledge. The trial court sustained the plea of prescription holding that plaintiffs should have asked the doctor what caused the blockage of the ureter when the blockage was removed in February 1973.
The trial court further held that the portion of plaintiffs' suit directed against the wrongful removal of plaintiff-wife's fallopian tubes and ovaries had also prescribed because the doctor who had performed the removal of these organs had shortly after the surgery read to her a pathology report which contained information that there was no acute inflammation of these organs at the time of their removal. The supreme court reversed the judgment sustaining the plea of prescription holding that plaintiffs were not required, based upon the knowledge of the blockage of the ureter, to have asked why the blockage occurred, nor were they to be held to a superior ability to interpret the pathology report. This report contained some information which could have been construed to have justified the removal of the tubes and ovaries. The court in the opinion stressed the fact that plaintiff-husband was a butcher and both plaintiffs had confidence in the doctor who performed the surgery.
We conclude that the rationale of Young v. Clement, supra, is applicable to plaintiff, Hebert. See also Zeno v. Lincoln Gen. Hospital, 376 So.2d 1284 (La.App.2d Cir. 1979), wherein we held that a plaintiff who had a hemorrhoidectomy and removal of a rectal abscess in 1969 and who had endured pain in this area for years thereafter did not have knowledge of the malpractice until she was advised in 1977 by another doctor that the physician who had performed the surgery had cut her too deeply and that under these circumstances, her suit instituted within one year of having received this information had not prescribed.
Plaintiff, Hebert, who had only a fifth-grade education, received the forceful enema at a time when he was already enduring substantial pain and discomfort in the low back, an area of the body not far removed from the place where he received the painful enema. There is evidence establishing he was having constipation problems as an after-effect of the anesthesia he received at the time of the performance of the laminectomy. There is no reason why plaintiff should be considered as having been put on notice by the pain of the enema on August 31st that the pain and discomfort he was having in the rectal and colon area on September 5th were related to it. There can be no justification for placing this superior knowledge of the causal relation between the enema and the colostomy upon plaintiff when at least three of the physicians who participated in the surgeries required by the gangrene of the rectum and who were aware of the enema did not relate the enema to the cause of the gangrene. Plaintiff's ignorance cannot be said to be willful or resulting from his neglect when he had his family doctor write Confederate for the medical records and when these records were received by his physician they indicated that one of the doctors at Confederate who examined plaintiff on January 8, 1972 stated that the reason for the gangrene was unknown. Plaintiff's family doctor was not required to consider this information unreliable and to continue to seek additional information from the hospital hoping that somewhere there could be found a reason for the infection which caused the colostomy.
*551 The fact that there exists in the hospital records positive statements by physicians that the enema caused the gangrene, which caused the colostomy, cannot be construed as constructive knowledge on the part of plaintiff who was unaware that these opinions had been expressed by physicians familiar with his case. Neither the operation report of September 5th nor the out-patient clinic report of Dr. Baskin of August 14th, referred to by the trial judge in his reasons for judgment, was included in the information sent to Dr. Tugwell by Confederate.
We conclude that plaintiff had no notice requiring him to make additional investigations as to the cause of his colostomy which could possible be construed as constructive knowledge. Under these circumstances, the suit filed by plaintiff within less than one year after he first learned of the relationship of the enema to the colostomy in February, 1974 was timely filed.
The judgment sustaining the plea of prescription is REVERSED and the case is REMANDED for further proceedings consistent with the views herein expressed. Costs of the trial of the exception and of this appeal are assessed against defendant.