770 So.2d 392 (2000)
K.D.D. SMITH
v.
CUTTER BIOLOGICAL, a Division of Miles, Inc., et al.
No. 99-CA-2068.
Court of Appeal of Louisiana, Fourth Circuit.
September 6, 2000.
Rehearing Denied October 13, 2000.
*394 Charles F. Gay, Jr, E. Paige Sensenbrenner, Adams & Reese, New Orleans, Louisiana; Robert Limbacher, Dechert, Price & Rhoads, Philadelphia, PA, Counsel for Baxter Healthcare Corporation.
James B. Irwin, Francis P. Accardo, Brigid B. Glorioso, Montgomery, Barnett, Brown, Read, Hammond & Mintz, L.L.P., New Orleans, Louisiana; Sara J. Gourley, Tamar B. Kelber, Sidley & Austin, Chicago, IL, Counsel for Armour Pharmaceutical Company.
Lawrence E. Abbott, Deborah D. Kuchler, Stacy Patton Anderson, Abbott, Simses, Knister & Kuchler, New Orleans, Louisiana; Philip S. Beck, Lindley J. Brenza, Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL; Jennifer E. Heisinger, Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO, Counsel for Alpha Therapeutic Corporation.
Jonathan C. McCall, John F. Olinde, Mary L. Meyer, Douglas L. Grundmeyer, Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., New Orleans, Louisiana; Terry O. Tottenham, Lana K. Varney, Fulbright & Jaworski, Austin, TX, Counsel for Bayer Corporation.
Thomas W. Mull, Frances Phares, Mull & Mull, Covington, Louisiana; Michael L. Baum, Baum, Hedlund, Aristei, Guilford & Downey, Los Angeles, CA; James W. Orr, Bowers Orr & Dougall, L.L.P., Columbia, SC; Mack E. Barham, Robert E. Arceneaux, Barham & Arceneaux, New Orleans, Counsel for K.D.D. Smith.
Court composed of Chief Judge ROBERT J. KLEES, Judge WILLIAM H. BYRNES, III, Judge MICHAEL E. KIRBY.
BYRNES, J.
This case was originally filed by the plaintiff, Ken Dixon on May 10, 1993, against Cutter Laboratories (subsequently acquired by Miles, Inc. and then Bayer Corporation), a manufacturer of hemophilia clotting factor used by him. On February 3, 1994, by supplemental petition, he added three additional defendant-manufacturers Alpha TherapeuticCorporation, Armour Pharmaceutical Corporation, and Baxter Healthcare. In his petition, as amended, Mr. Dixon alleged that the four companies (sometimes referred to hereafter as the "fractionator defendants") had operated separately and in combination to allow their medicine to become contaminated with the HIV virus, thereby infecting him; and that they had fraudulently concealed their wrongful conduct in order to insulate themselves from litigation. He alleged that the companies' products had caused him to contract AIDS, and that he would die as a result. Ken died on June 3, 1995, while his suit was pending. His parents, Leo and Shirley Dixon, substituted themselves as plaintiffs on March 13, 1997. All the fractionator defendants filed exceptions of prescription.
A jury found Bayer and Alpha liable for the negligent manufacture of an unreasonably dangerous product, and fraud, all of which were the cause-in-fact of Ken's death as a result of AIDS, and awarded $35,300,000 in survival and wrongful death damages.
However, the trial judge reserved the question of prescription to himself, including *395 the right to rule on factual issues related to prescription, which procedure was sustained by this Court in Doe v. Cutter Biological, 98-3058 (La.App. 4 Cir. 1/5/99); 727 So.2d 1187, writ den., 99-0075 (La.1/13/99); 735 So.2d 642. Accordingly, the trial judge rendered reasons for judgment on March 15, 1999, holding that the plaintiffs' claims had prescribed, and signed a final judgment on March 16, 1999, dismissing plaintiffs' claims, stating that the defendants' exceptions of prescription "supersede rendition of a judgment on the verdict of the jury." Subsequently, on its own motion, the trial judge ordered the parties to show cause why a new trial should not be granted. After a hearing, the trial judge confirmed the correctness of his original ruling and recalled his motion.
The plaintiffs' appealed. Bayer answered the appeal, contending that if the ruling on prescription is overturned by this court, then the case should be remanded to permit the trial judge to enter judgment on the jury verdict. Should this Court overturn the judgment on prescription, but decide against a remand, then Bayer's answer contends that the jury verdict should be vacated, or alternatively, that the damage award should be vacated or substantially reduced.
Alpha filed an answer to the appeal contending that should this Court overturn the judgment on prescription, then the matter should be remanded to the trial court, or in the alternative, the judgment should be affirmed on other unspecified grounds.
Kenneth Dixon was born with severe hemophilia in 1967. He began treatment with factor concentrate (for a more detailed description of this treatment refer to this Court's opinion in Cross v. Cutter Biological, 94-1477 (La.App. 4 Cir. 5/29/96); 676 So.2d 131, 135-136, writ den. 96-2220 (La.1/10/97); 685 So.2d 142), by intravenous injection in Alabama in 1976. He maintained this course of treatment until August of 1981 when he moved to Louisiana where he continued treatment through the Louisiana Comprehensive Hemophilia Care Center at Tulane University. He received factor concentrates for home use to control bleeding when it occurred. Beginning in January of 1982, Kenneth Dixon and his family kept logs recording his use of factor concentrate by date, quantity, and brand name. In July of 1982, illnesses were reported in three hemophiliacs, which in retrospect were determined to be HIV related, although the retrovirus had not even been named at the time. For an excellent discussion of the history of HIV, AIDS, and their relationship to hemophilia again refer to this Court's opinion in Cross v. Cutter Biological, 676 So.2d at p. 136-138. When the immune system destroying symptoms of the virus advance to a certain stage, it is referred to as "AIDS" (acquired immune deficiency syndrome) and eventually leads to death.
In November of 1985, Dr. W. Abe Andes, Ken's treating hematologist, told him that a test of a sample of his blood was HIV positive. This sample had been drawn and stored since July 27, 1982, long before it could have been identified through a commercially available blood test. It was Dr. Andes' opinion that the source of the infection was the factor concentrates that Ken had been taking to control bleeding. From his own medical records and home infusion logs, Ken knew the identities of all four fractionator defendants, what factor concentrate he had infused, when he had infused it, and which fractionator defendant had prepared it. Kenneth Dixon was 18 years old, of full age of majority, when he learned of his diagnosis of HIV from factor concentrates.
The trial judge found that:
Ken did not know that he was infected with HIV, the AIDS virus, until that November 1985 day that he visited the Comprehensive Care Center at Tulane University Medical Center and was told by his treating physician, W. Abe Andes, that he tested positive for HIV antibodies, *396 based upon a stored 27 July 1982 blood specimen. It is more probable than not that Andes told Ken that testing positive for HIV did not mean he, Ken, would contact AIDS. At that time, it was not absolutely certain that a person who tested positive for the HIV antibodies had live HIV in his or her body, because antibodies are formed as the body fights off (neutralizes) invading viruses, microorganisms, and bacteria. The presence of antibodies means that some of the disease causing agent has been killed.
It may have been true that in 1985 Kenneth was led to believe that his exposure to HIV would not necessarily lead to AIDS, but between 1985 and 1990, information from his treating physicians and other sources came to his attention letting him know that HIV (commonly referred to as the AIDS virus) infection destroys the immune system, and that it leads to AIDS which is fatal. Dr. Charles Hamilton, his treating physician, testified that there was "[a]bsolutely no doubt" that plaintiff and his parents were informed about issues of AIDS and hemophilia. Dr. Hamilton testified that Ken first told him that he was HIV-positive in January or February of 1987. He testified that it was his practice to immediately disseminate information received from the National Hemophilia Foundation to his patients. Dr. Hamilton described Ken's parents as being of above average knowledge concerning hemophilia and very attentive to their two hemophiliac sons. The Dixon's were on the board or various committees of the Louisiana Hemophilia Foundation and were well informed about AIDS and hemophilia. In 1987 Dr. Hamilton specifically discussed the possibility of Ken developing AIDS as a result of his treatments for hemophilia, and it was at that time that Ken first mentioned to him that he was HIV positive. He was certain that Ken was aware that it was through his hemophilia treatments that he had contracted the virus.
In early 1988, Kenneth Dixon developed pneumonia, and Dr. Hamilton referred him to Dr. Ernest Wong, an HIV/AIDS specialist, to determine if the pneumonia was indicative of progression of his HIV infection to AIDS. In February 1988 and in a follow-up visit in February 1990, Dr. Wong frankly told plaintiff that HIV was attacking his immune system and that plaintiff would eventually progress to AIDS, get opportunistic infections and die. Dr. Wong described how he spent a lot of time explaining an HIV/AIDS diagnosis to young patients such as Ken, because they have trouble accepting such a diagnosis. Dr. Wong testified that at the time he first saw Ken in 1988 the understanding was that Ken was virtually certain to develop AIDS, although by the time he gave this testimony it was no longer such a medical certainty because of progress that had been made in preventing the normal progress of the HIV infection.
Dr. Wong also noted that he felt that Ken was of above average intelligence, and his sister-in-law, Cheryl Dixon, testified that he was "bright."
In November, 1989, Dr. Andes, Ken's hematologist, explained in a letter to him that he could try a new therapy with the drug AZT, which might slow the reproduction of HIV in his system, thereby delaying "progression of the disease (on to AIDS) in HIV-infected people who have no symptoms."
Tyrone Dixon, Kenneth's younger brother (and also a hemophiliac) testified that he was informed at a family meeting that had to have taken place prior to 1990, that Kenneth was HIV positive. Both he and his mother cried at the meeting. This admitted grief at learning of the diagnosis is inconsistent with family testimony that they did not believe that Ken would develop AIDS. For the same reason it supports the trail judge's finding that Ken knew or should have known of the existence of a cause of action several years prior to the time he filed this suit. Tyrone also testified *397 that Kenneth was smarter than he was because "he was book smart."
Leo Dixon testified that he drove his son Kenneth home after his appointment with Dr. Andes in November of 1985. Kenneth told him that Dr. Andes had told him that he was HTLV-III (HIV) antibody positive but not to worry, that nothing would ever come of it. But Kenneth was concerned enough that he could not sleep. Additionally, Ken and his father decided not to tell Ken's mother because it would worry her and, as noted previously, she cried when they eventually told her. The emotional reactions to the diagnosis of infection, or possible infection, are such as to belie the testimony that every one in the family thought that Ken had nothing to be concerned about as a result of the diagnosis.
Shirley Dixon admitted that in 1991 she understood that Kenneth had the virus that caused AIDS. A 1994 letter purporting to be from Mrs. Dixon, that she acknowledged appeared to be in her handwriting, said that "my life was shattered to learn of my son's diagnosis with HIV in 1985." This is not the reaction of a mother who believes that her son's HIV infection is anything less than catastrophic.
Moreover, we note that Mr. Dixon's testimony that he thought Kenneth's HIV was a dead virus that could do no harm is inconsistent with his admitted advice to Kenneth to practice safe sex because he was HIV-positive. Additionally, Mr. Dixon testified that when Ken came down with pneumonia in 1988 that the family thought it was because of his HIV-positive status. Mr. Dixon knew in 1988 when Kenneth was diagnosed with pneumonia what opportunistic infections were and that some types of pneumonia were considered to be opportunistic infections. He also understood the relationship between Kenneth's HIV and opportunistic infections. He acknowledged that he had heard that the presence of certain types of pneumonia is an indication of AIDS.
In his deposition taken prior to his death, Kenneth Dixon said that he graduated from high school in 1985. He went to USL, Acadiana Tech, and the Louisiana Art Institute where he got a degree in commercial art. Kenneth said he first became aware of AIDS in high school in 1985. He testified that he learned "maybe four or five years ago" that AIDS was caused by HIV.
Q. When were you first aware that the disease known as AIDS could be transmitted through the use of blood or blood products such as Factor VIII?
A. Well, I don'tI wasn't really aware of that until I was told that I had HIV. That'sThat's the only time I knew any thing like that could be, you know, transmitted like that. That was basically the first time.
Q. And Dr. Andes informed you that you had contracted the HIV virus through the use of Factor VIII?
A. Through the clotting of blood, yeah.
Q. Factor VIII?
A. Yeah.
Ken testified that Dr. Andes first informed him of his HIV status in November of 1985. He also testified that the social workers at Tulane would discuss safe sex with him after he learned that he was HIV positive. He recalled that at the time he went to Chicot State Park that HIV caused AIDS and that AIDS could cause death. When he was told that he had HIV antibodies in his system, he was told not to worry at that time, but that the virus could cause AIDS. He said the doctor told him that it might never lead to AIDS, but he was also told that the factor concentrate was the source of his HIV infection. However, he also testified that this was not his only source of information about HIV:
"Later on, you know, just by things through the media, I knew it could be deadly, could develop into something."
This testimony is consistent with the trial judge's disbelief that it was possible for Ken and his family not to know of and *398 appreciate the implications and seriousness of his HIV infection. When asked when he first learned that AIDS could be serious, he said it was in the year following the 1985 revelation that he had HIV. But he qualified it to say that he heard things in the media but he just wasn't sure.
In January of 1993 he started taking AZT.
Moreover, we note that during this period of time, the legislature enacted Act 663, § 1 of 1987 (LSA-R.S. 14:43.5), which act made it a felony offense to "intentionally expose another to any acquired immunodeficiency syndrome (AIDS) virus ..." Technically there is no such thing as the AIDS virus. HIV is the virus (retrovirus) and AIDS is the name given to the symptoms caused by the virus after it has wreaked a certain degree of havoc on the body. However, the legislative language reflected the interchangeability of the two terms in the minds of the general public. In fact, an attack on the statute for unconstitutional vagueness based on the alleged confusion between the two terms was rejected in State v. Gamberella, 633 So.2d 595, 602-603 (La.App. 1 Cir.1993), writ den. 94-0200 (La.6/24/94); 640 So.2d 1341. The criminal charges against the defendant in Gamberella arose out of sexual activities engaged in by the defendant after he was diagnosed as being HIV positive. As to there being any doubt about the relationship between HIV and AIDS the court had this to say:
Defendant further notes that the phrase "acquired immunity deficiency syndrome (AIDS) virus" is a misnomer because the actual virus is the human immunodeficiency virus (HIV). [Footnote omitted.] AIDS is not the virus but rather, is a clinical syndrome which is diagnosed when a person, who is infected with the HIV virus, develops one of a certain list of infections. Despite the legislature's failure to correctly label the virus which causes AIDS, the language of the statute is not vague. As Dr. Brandon testified, although the medical community makes a distinction between a person being HIV positive and having AIDS, "people have called it for years the AIDS virus." [Emphasis Added.]
Id. Thus, the language employed by the legislature in Act 663, § 1 reflects the fact that in every day parlance the HIV virus[1] is also referred to as the AIDS virus, i.e., by 1987 the general public fully understood the relationship between an HIV diagnosis and AIDS, and this fact has been recognized by the judiciary.[2]
We also note that Acts 1987, No. 234, § 1 enacted Part XXXV of Chapter 5 of Title 40, LSA-R.S. 40:1299.141, et seq., entitled "Acquired Immune Deficiency Syndrome," required testing for AIDS of donated blood or tissue, necessarily referring to HIV testing. Acts 1991, No. 1054, § 1 Part XLI of Chapter 5 of Title 40, LSA-R.S. 40:1300.11, et seq., entitled "Confidentiality of HIV Results," was enacted in recognition of the seriousness of any disclosure of HIV test results because of the legitimate association in the minds of the general public of such test results with AIDS. The need for confidentiality of HIV test results was not a reflection of legislative recognition of advances in medical knowledge as of 1991; rather it was a reflection of the general public's conviction at that time that a diagnosis of HIV was a diagnosis of AIDS, and a diagnosis of AIDS was a death sentence.
In Bordelon v. St. Frances Cabrini Hospital, 93-1331 (La.App. 3 Cir. 5/4/94); 640 So.2d 476, 479, the court discussed HIV and AIDS noting the public's concern arising out of "the massive information campaign[3] waged by federal, state and local *399 officials over the last few years to educate the public about this dreadful disease"[4] and that "It is common knowledge that AIDS is both incurable and fatal."
The Bordelon court recognized a cause of action for fear of having been infected with HIV "without accompanying physical injury ."[5] If a cause of action exists for a mere fear of HIV infection (assuming that the fear was reasonable) without actual infection, per force a cause of action accrues when one has actual knowledge of actual infection. It is also interesting to note that the Bordelon opinion uses the terms HIV and AIDS interchangeably: "It is widely known that HIV can be transmitted through blood transfusions even with the standard procedure for screening for AIDS." Id. at p. 479. Later in the same paragraph the Bordelon court also makes a reference to "the transmission of AIDS" when clearly what is intended would technically be the transmission of HIV.
Department of Health and Hospitals, Huey P. Long Regional Medical Center v. Jeffress, 593 So.2d 680, 683-684 (La.App. 1 Cir.1991), discusses a report of a State Civil Service Commission Referee dated April 2, 1990, but based on an incident that occurred on April 6, 1988. The Jeffress opinion refers to "HIV (the AIDS virus)" and "the HIV patient" and "dealing with AIDS patients", all interchangeably.
In Stockle v. Zimmer, USA, Inc., 610 So.2d 132 (La.App. 4 Cir.1992), writ granted 612 So.2d 68 (La.1993), writ den. 612 So.2d 68 (La.1993) and dismissed 619 So.2d 1059 (La.1993), this Court used the terms HIV and AIDS interchangeably, referring *400 to "AIDS tainted blood" at p. 132 which technically should have read "HIV tainted blood." On the next page of our opinion in Stockle, this Court used both terms in the same paragraph:
In April, 1986, Raymond Stockle was diagnosed with AIDS. On April 1, 1987 Raymond Stockle notified a representative of defendant Pathology Laboratory that he was HIV positive. During a telephone conversation, he expressed his belief that a connection existed between his HIV infection and the blood that had been transfused into his body during the surgeries performed on his back at St. Charles General Hospital in December, 1984 and March, 1985. Despite the fact that he was aware of the connection between his HIV infection and the blood transfusion, he never attempted to sue the Hospital and did not add the Blood Center for Southeast Louisiana as a defendant in his pending litigation until January, 1990. He did not attempt to add Dr. Treuting, Dr. Simpson and the Pathology Laboratory as defendants in his pending litigation until May 2, 1990. [Emphasis added.]
Id., at p. 133.
On rehearing this Court addressed Stockle's contra non valentem arguments:
The record clearly established that as of April, 1987, plaintiff, Raymond Stockle knew that he had tested positively for the AIDS[6] virus and that he strongly suspected the condition was directly caused by the blood transfusion that he had received in December, 1984. No one disputes the fact that the plaintiff, Raymond Stockle called the Pathology Lab and specifically told a representative about his condition and his suspicions concerning the cause of his condition. Nevertheless, despite the fact that he already had litigation pending against the manufacturers of the allegedly defective wiring that had been placed in his back during the same operation, he made no attempts to add the appellees as defendants in the pending litigation until 1990. Since we have already determined that the newly added defendants are not solidarily liable with the originally named defendants, it is clear that the plaintiff should have named the appellees as defendants one year from the date he knew of his cause of action against them. That date would have been some time in April 1988. Since he failed to timely name the appellees as defendants, his action against these defendants are barred because of prescription. [Emphasis added.]
Id., at p. 136.
We can infer from LeBlanc v. Meza, 620 So.2d 521 (La.App. 3 Cir.1993); writ den. 93-1838 (La.7/1/94); 639 So.2d 1176, that by August of 1989 insurance companies were routinely testing life insurance applicants for HIV because of its relationship to AIDS.
The foregoing survey of the jurisprudence of HIV and AIDS related cases allows us to infer from sources extraneous to the record that no reasonable fact finder could conclude that Kenneth either did not know or did not have reason to know that he had a cause of action prior to the end of 1989 in connection with his HIV infection, arising out of the relation of that infection to AIDS.
We must agree with the trial judge's conclusion that:
This Court finds it incredible that Ken did not know about HIV and its relation to AIDS. His parent's and his activity in the hemophilia community preponderates to the reasonable conclusion that he knew more than the average person about AIDS. That he tried in his own mind to believe he would beat the odds does not excuse his failure to file suit to interrupt the statute of limitations.
Under the facts of this case, the issue of prescription raises questions of both fact and law. The trial judge's factual *401 findings concerning prescription should not be reversed by this Court in the absence of manifest error. See Nicosia v. Doe, 563 So.2d 1359 (La.App. 4 Cir.1990). Prescription begins to run when damage to the plaintiff has manifested itself with sufficient certainty to support accrual of a cause of action. LSA-C.C. art. 3492; Cameron Parish School Bd. v. Acands, Inc., 96-0895 (La.1/14/97); 687 So.2d 84, 88; Cole v. Celotex Corp., 620 So.2d 1154, 1156 (La.1993). Where the tortious act has been completed, prescription runs from the date the plaintiff suffers actual or appreciable damage, even though he may thereafter come to a more precise realization of the full extent of his damage or may incur further and future damage because of the completed tortious act. See Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 352 (La.1992); Steele v. Steele, 98-693 (La.App. 5 Cir. 3/10/99); 732 So.2d 546, 550, writ den., 99-0995 (La.5/28/99); 743 So.2d 674. "[T]here is no requirement that the quantum of damages be certain or that they be fully incurred, or incurred in some particular quantum, before the plaintiff has a right of action." Dixie Graphics, supra, at p. 354. Acands, supra. "Ignorance or misunderstanding of the probable extent or duration of injuries materially differs from ignorance of actionable harm which delays commencement of prescription." Fontenot v. ABC Ins. Co., 95-1707 (La.6/7/96); 674 So.2d 960, 964. The possibility of permanent damage is enough to start the prescriptive period, even though an ultimate prognosis can only be given later. Sumerall v. St. Paul Fire & Marine Ins. Co., 366 So.2d 213, 214-215 (La. App. 2 Cir.1978).
The Sumerall court also quoted from Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285 (1970), to the effect that constructive knowledge is:
"... whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry, is sufficient to start the running of prescription."[[7]]
The trial judge made the following findings of fact: In November of 1985 Kenneth was informed by his treating physician, Dr. W. Abe Andes, that he had tested positive for HIV antibodies, based upon a specimen of his blood that had been held in storage since July of 1982. But, based on the more limited knowledge of the nature of HIV infection that existed at that time, Dr. Andes most likely told Kenneth that this test result did not necessarily mean that he would develop AIDS.
However, the trial judge further found that: In the summer of 1988, Kenneth contracted pneumonia; while hospitalized, Dr. Ernest Wong informed Kenneth that the type of pneumonia he had was not one associated with the opportunistic infections characteristic of AIDS; but at the same time Dr. Wong did tell Kenneth that his HIV would progress to AIDS and eventually to death.
The trial judge found that at this point in time Kenneth had the sentence of certain AIDS and death from Dr. Wong as contrasted with the previous more optimistic opinion of Dr. Andes. The trial judge noted that Kenneth was of,
"above average intelligence and of apparent talent, participated in the Louisiana Chapter of the National Hemophilia Foundation ("LCNHF"); he attended meetings with his parents, even spoke at one meeting, and his father was an officer in the chapter. No evidence establishes that Ken reviewed every piece of literature on AIDS that was mailed to his home, but it is more likely than not that he received and read Bayer Exhibit 10000, copy of which is attached as Appendix A.

*402 The evidence fails to establish by a preponderance that Ken ever read any literature that specifically defines AIDS as a disease resulting from HIV, indicated by a T-cell (T4 lymphocyte) count of below 200 and the presence of one or more opportunistic infections, such as pneumocystis carinii pneumonia, Kaposi's sarcoma, etc. And the evidence fails to establish that Ken precisely understood the definition [emphasis original] of AIDS, although he did know AIDS was a dangerous and deadly disease. But, he knew of opportunistic infections and the subject of T-cells from his and his parent's participation in the LCNHF. AIDS is, essentially, the end stage of the infection of HIV as it kills off the immune cells that fight off disease.
Further, it is more likely than not that Ken tried to deny in his own mind that his HIV would lead to AIDS or that he would die of AIDS. He thought he would beat the disease, which is not unusual reaction of a young adult, for youths think, frequently, that they will proverbially live forever. Bayer Exhibit 10000, dated 1 November 1989, was more likely than not received by Ken and put him on notice that his HIV would eventually lead to AIDS and ergo, death. (And, certainly, Factor VIII concentrates eventually had warning labels in 1984 about the AIDS virus once the FDA authorized the labeling change.)
Thus, under the scenario most favorable to Ken, the one year liberative prescriptive period commenced to run (giving time for the postal delivery service to deliver) within two weeks of the 1 November 1989 letter. His claims prescribe on or about 15 November 1990. His 19 May 1993 filing is thus too late.
Thus the trial judge found that at the very latest, Ken's claim prescribed on November 15, 1990, two and one-half years prior to the time he filed suit. Based on this Court's review of the legislative and jurisprudential history discussed above, we find it difficult to believe that any reasonable fact finder could have found anything other than that prescription commenced to run at the very latest in 1987, by which time Dr. Hamilton had informed him of the probable connection between his HIV infection and his hemophilia treatments, the Louisiana legislature was enacting AIDS related legislation, and HIV and AIDS related issues had received massive media attention for some time, not to mention particular information directed to the hemophilia community.
In view of the foregoing, nothing done by the defendants would excuse the failure of Kenneth Dixon to file this claim in a timely manner.

Leo and Shirley Dixon's Wrongful Death Claims
Kenneth Dixon's parents' wrongful death claim prescribed in one year from the date of his death on June 3, 1995. Taylor v. Giddens, 618 So.2d 834 (La. 1993). The filing of their claim on March 13, 1997, came too late. The trial judge noted that they had knowledge of the causal relationship between the factor concentrate, HIV, AIDS, and their son's death "from their activity with the LCNHF, discussions with physicians, health care personnel and the news."
The trial court rejected the plaintiffs argument that prescription was interrupted because of the continuing nature of the tort inflicted on the decedent, based on theories of reinfection, aggravation of infection and viral loading. The trial judge noted that although he had admitted the testimony of Dr. Andrew T. Pavia in support of these theories, he had concluded that the preponderance of evidence shows that such theories are not reliable under the standards set by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and State v. Foret, 628 So.2d 1116 (La.1993). It is the responsibility of the trial judge, not the jury, to apply the standards found in Daubert and Foret, and *403 it is especially so where it bears on factual findings in connection with the issue of prescription. The trial judge found that:
The Court has no evidence to show that any HIV in Ken's body was not the same virus with which he was initially infected or a natural mutation of the original virus that occurred in Ken's body. Moreover, Ken died approximately 13 years after his seroconversion,[8] which is precisely the average length of time between seroconversion and death.
Dr. Andrew Pavia's testimony was critical to plaintiffs' theory that the decedent was subjected to multiple infections with HIV and multiple assaults on his immune system over a period of time, such multiple exposures constituting multiple or continuing torts. But Dr. Pavia admitted that of the many articles and text that he wrote none have to do with "dual infection", or multiple infections with HIV.
Dr. Pavia testified that there is evidence of multiple infection in chimps but, "We're unlikely to be able to prove that in people very effectively." However, because there is evidence of recombinant types of HIV (which we might think of as hybrid strains), it is Dr. Pavia's opinion that there are dually and multiply infected people. It is his belief that people might have less resistance to a second infection where it consists of a slightly different variation of the original infection. Dr. Pavia testified that subsequent to initial infection with HIV, infusion of product "containing many viruses, including HIV, was likely to exacerbate his disease, lead to an increase in his viral load and, ultimately, to increase progression ... [t]o AIDS and to death." Plaintiffs offered no evidence in support of Dr. Pavia's theory outside of his own opinion, nothing that would even begin to approach Daubert standards.
If there were merit to Dr. Pavia's theory, one would expect that those hemophiliacs receiving the most infusions would show a more rapid progression of HIV to AIDS, but Dr. Pavia admitted that:
It is true that the studies that have looked at rates of progression by factor usage have not shown a clear and consistent pattern towards progressing more rapidly in heavy users than in light users.
Dr. Pavia admitted that one explanation for this is that there is no harm arising out of subsequent exposures. The totality of his testimony does not support a finding that, more likely than not, Kenneth's condition was exacerbated by multiple exposures.
Kenneth Dixon's death thirteen years after the first six months of 1982, which is when Dr. Pavia estimates the infection occurred, is within the normal range of 12 to 14 years from infection to death. There is nothing in Kenneth's medical records to suggest that reinfection took place, but Dr. Pavia said that you wouldn't expect to find any such thing. Dr. Pavia also admitted that there was less than a 1% chance that any factor he took after 1984 was infected with HIV. He further admitted that in a 1994 trial he expressed the opinion that he would expect to see a precipitous decline in the health of one who had been reinfected, but he now says that "nobody has highlighted any clinical syndrome that appears to say that it's happened." He then testified that "it would not be clear from the medical record but there are some things that you would see that would make you suspicious [that reinfection had occurred]." However, he admitted that he had not seen anything that would arouse such suspicions in Kenneth's medical records.
Dr. Pavia made other admissions including that there is no documented case of reinfection in a person with hemophilia and that there is no documented case of reinfection of anyone in the general population either. He explains that there have been no studies attempting to find such an occurrence. Moreover, no study has looked *404 at viral loads throughout the course of the HIV. Dr. Pavia admitted that a study done during 18 to 36 months after seroconversion, i.e., after HIV infection had been effected, did not support his theory about viral loads. Dr. Pavia read from a 1995 study entitled "Human Immunodeficiency Virus Type 1 Infection: Relationship of Risk Group and Age to Rate of Progression to AIDS." The study involved one group that would not be expected to have multiple exposures to HIV (one-time transfusion recipients), and two groups where multiple exposures could be expected (intravenous drug users and homosexuals). The study showed no difference based on risk group of progression from HIV infection to the development of AIDS, contrary to what would be expected where certain groups, such as hemophiliacs, would be assumed to have many more exposures to HIV. The study concluded that:
Subsequent inoculations with strains differing from the original may permit superinfection, recombination, or both. However, in vivo infections with two strains has seldom been documented thus far and only at or around the time of first infection. In our study, the lack of difference between blood recipients, who probably had only one exposure, and homosexuals and hemophiliacs, who undoubtedly had many, does not suggest that secondary HIV-1 infections or recombinant infections progressed more rapidly than did initial infections.
It is not surprising that Dr. Pavia's response that "[A]bsence of proof doesn't prove that it didn't happen" failed to sway the trial judge. Dr. Pavia noted that the article was published in 1995 "and that there are only a few cases of dual infection reported today." Dual infection is not necessarily the same as reinfection. Dual infection refers to the presence of more than one strain of HIV in an individual. Dr. Pavia infers the existence of reinfection from the existence of dual infection. But there is no evidence that Kenneth had dual infection. The single instance of dual infection that was described in an article by Dr. David Ho occurred as a result of multiple sexual contacts that took place in one orgy like encounter in a sauna. This was consistent with the previous study that said that reinfection was unlikely to occur in the first three years.
We find Dr. Pavia's testimony no more persuasive than did the trial judge. It struck this Court as being particularly tendentious and singularly lacking in both objectivity and the basic fundamentals of the scientific methods of proof. In fact, we find Dr. Pavia's testimony so lacking in any recognized basis of scientific reliability, that had the trial judge chosen to rely on Dr. Pavia's theory of multiple infections in preference to the evidence to the contrary we would be forced to conclude that such a finding was manifestly erroneous and an abuse of the trial court's discretion as "gate-keeper" under Daubert, et al. v. Merrell Dow Pharm., Inc. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and State v.Foret, 628 So.2d 1116 (La.1993).
Plaintiffs contend that "Dr. Pavia's testimony has already been approved by this Court as a basis upon which a jury might find aggravation based upon subsequent exposures to the HIV virus," citing Cross v. Cutter Biological, 94-1477 (La.App. 4 Cir. 5/29/96); 676 So.2d 131, writ denied, 96-2220 (La.1/10/97); 685 So.2d 142. However, in Cross this Court did not consider a Daubert/Foret challenge to Dr. Pavia's testimony. In Cross the only expert testimony challenged on Daubert/Foret grounds was that of a Dr. Thomas Drees. Moreover, we note that in spite of Dr. Pavia's testimony, this Court sustained a directed verdict in favor of the defendant. Cross provides no support for Dr. Pavia's testimony in the face of scientific scrutiny.
On the other hand we find the testimony of the defendant's expert, Dr. David Julian Volsky much more logical, objective and persuasive. Dr. Volsky, a scientist and professor at Columbia University and St. Luke's/ Roosevelt Hospital, provided a *405 very credible description of what occurs when there are subsequent exposures to the same infective agent (superinfection):
So we know in individuals who continued to be exposed to the virus and they were tested, there's not a single publication, at least, that shows that the person was infected with one virus and, five years later, another virus established an infection in that person. Although we know of many examples now that people can simultaneously get infected with a number of viruses.
So there isAnd there's usually no more than two viruses, even in co-infection. So there's some strong mechanism that we don't understand that prevents establishment of infection with a very similar kind of virus in a person.
Dr. Volsky opined that the window for reinfection by a different strain of HIV would be two to several months. Whatever the time period within those limits, prescription on any claim based on reinfection or subsequent exposures through contaminated hemophilia treatment would have run long belong the instant claim was filed.
Dr. Volsky testified that in the chimp test that Dr. Pavia referred to, the chimp was exposed first to one strain of HIV, then fifteen months later to a second strain, and six more months after that to a third. Ten years later that chimp developed AIDS. The third strain did not take:
That tells me that if we're talking about these windows, in chimpanzee's at least, and we have no idea how it compares to humans, but in those animals, the window is something between fifteen months and twenty-one months when an additional virus will infect anymore. So, clearly, those animals were resistant to the third virus.
When asked whether the notion of reinfection had been tested in any other animal models, Dr. Volsky replied:
The most recent example that I found in the article that I cited in the Journal of Virology in February was using another animal model that we try to develop, and that's infection of cats with a virus called feline immunodeficiency virus or FIV.
That's a model that some people believe is superior to anything else we have because, in cats, that virus, which is like HIV but it's a cat virus, cat retrovirus, causes disease with a sort of course that is similar to human AIDS.
It causes a disease over several years, it takes six or seven years to develop disease in cats, and it has all the characteristics of human AIDS except that it is caused by this feline virus.
And the study I'm talking about again attempted to superinfect, not for the not for mine or your benefit to test the theory but, obviously, trying to test a vaccination approach.
So what they did is to challenge the cats with a weakened virus Number 1, and that's a feline virus called FIV-3; and then seven months later, they challenged it with another very high dose. And the idea was to see whether the cats would be protected at this stage.
So they were not completely protected. But it's a very interesting study, they did get infected. In this case, they tried it on eight cats. So with eight animals, we can at least have some statistical basis as being maybe significant.
The cats did get infected with the second virus; however, it was interesting, the virus level went down, the virus load, as we call it, and the animals did not, the ones that were infected twice, did not progress to disease. And two years later, the second virus actually could not be found in these animals, in several animals they tested.
So the bottom line of this article is that although the infection initially occurred, the body of the animal, the cat, again, very different from human beings, was able to get rid of the second virus in a number of animals they tested. And they're following all the rest of the animals.

*406 So there was protection from Disease Number 1 and there was a protection from the second virus not immediate but over time. So there was some mechanism in this animal that did prevent the establishment of persistent infection with the second virus.
That tells me thatAnd. Again, they did it after seven months. I don't knowNo one knows at this stage what is this window that establishes protection. Perhaps if they tried after ten months, there would be no infection whatsoever with the second virus.
But it tells me that those mechanisms that prevent reinfection are very powerful, and I believe that they are acting in humans to prevent reinfection with additional strains of HIV.
When asked whether reinfection would cause a more rapid progression of the disease, Dr. Volsky testified:
Well, my opinion is that it wouldn't. Because, for one thing, that virus would not reinfect, as I already discussed. And were it hypothetically to reinfect a person, the person that is initially infected with HIV within just a couple of weeks generates so much virus that adding new virus from whatever source to that would be insignificant.
Dr. Louis M. Aledort gave testimony consistent with that of Dr. Volsky:
Q. Doctor, is there any scientific support for the notion that because he [Ken] continued to take medicine, some of which could have had other viruses in it or just foreign proteins, is there any evidence at all that exposure to these concentrates after he's already infected does any harm to anybody?
A. There are lots of evidence that it is just the reverse, that they don't do any harm. And there are a lot of data to support that.
Q. All right. Now, do you know that a gentleman named Dr. Pavia has testified and claims that after somebody is infected, if they have subsequent exposures, he calls it sometimes reinfection, or dual infection or aggravation, are you aware of the fact that Dr. Pavia has espoused this theory?
A. Yes.
Q. To your knowledge, has Dr. Pavia ever written any articles that could ever be reviewed by scientists where he would say this theory has validity?
A. No.
Q. Any you say that, as far as you're concerned, the science shows the opposite?
A. (Witness nods head affirmatively.) That's correct.
Q. Now, if there was any validity to Dr. Pavia's theory, would you expect that hemophiliacs would progress faster to AIDS than other people with HIV and die more quickly because they're constantly being reexposed to all these foreign materials? It there is any validity to his theory, would you expect that to happen?
A. Yes. You'd expect it but that doesn't happen.
Q. Okay. What's the truth of the matter.
A. The truth is actually almost the The older age group are just like every other group, meaning
Q. The older-aged hemophiliacs?
A. The older-aged hemophiliacs who have HIV infectionAIDS infection HIV infection are identical to those who got HIV from either a single unit of blood or they got it from homosexual activity or they got it from I.V. drug abuse.
The other group is quite different, and those are the young people. If anything, they have done far better longer than any other group that is in the literature.
Q. The young hemophiliacs?

*407 A. The young hemophiliacs.
Q. Even though they're being constantly reexposed to whatever is in the medicine.?
A. That's exactly right.
Q. Now, if there were any validity, any merit to Dr. Pavia's theory, would you also expect to see that the hemophiliacs who use a lot of medicine get sick faster and die sooner than the hemophiliacs who don't use as much because they're being exposed to more and more and more of these foreign materials?
A. Again, theoretically that's correct. That's not what happens.
Q. What happens in the real world?
A. There wasOnce you're infected with HIV, except for the young people who do very, very well, there was no difference whether you got exposed with a lot or a little.
And the best example from transfusion in their life and they got HIV. And they were identical to the hemophiliacs who had multiple infectionsmultiple exposures to continued factor concentrate.
Q. Now, you indicated that Dr. Pavia had never actually, to your knowledge, written any articles where he would put his theory out there in the scientific world to be tested.
A. Correct.
Q. Did you and the other people who were involved in this multicenter study, did you and the other doctors and scientists who work in the field study this to see whether the amount of factor concentrates that somebody is exposed to, whether that would have any impact on how quickly they progressed to AIDS?
A. Yes, we wrote a paper on theon what happens to HIV-positive patients, hemophilia patients, no matter what age they were, by not only what product they got but how much they got.
And there was zero relationship to the amount or whether or not they were high purity, low purity. And AIDS-defining illness, which is what we talked about before, whether or not you were classified as AIDS or death, absolutely none. And it's the most definitive paper in the literature about this.
We must bear in mind that Kenneth Dixon and his parents bore the burden of showing a suspension or interruption of prescription, because his claim had prescribed on its face. Therefore, even if we were for purposes of argument to concede the possibility that there might be some merit to Dr. Pavia's theories, plaintiffs' burden of proof requires more than a showing of possibility. It is uncontested that the decedent was infected, and knew he was infected, many years prior to the original filing by the decedent. The record also permits the finding that the prognosis of eventual AIDS related death was virtually inevitable.
We can find no manifest error in the trial court's findings that the decedent knew or should have known that he had the HIV infection caused by the infusion of Factor VIII; that he knew who the manufacturers of the Factor VIII were because he kept logs; and that the infection was progressing and progressively damaging his immune system, regardless of whether he knew for certain that he would develop full blown AIDS.
Moreover, the record shows that well over a year prior to the time he filed suit, Kenneth discussed the possibility of treatment with the drug AZT. This Court finds it difficult to believe that by the time AZT became available for treatment that any adult of reasonable intelligence did not know of the relationship of HIV to AIDS, and that AIDS was a dreaded disease. For more than the past decade newspapers, magazines, TV, and even theater have been full of references to the subject. It is a topic that has generated more than just the normal interest in health issues. A great deal of publicity has been generated by the societal controversy sparked by differences of opinion, often strongly felt *408 and acted upon, concerning how society should deal with the HIV infection and AIDS, including questions of quarantine, employment, etc., such that even in the absence of Kenneth and his parents' special reasons[9] to be especially well informed on the issue, it is difficult to believe that any adult of average intelligence would not have been sufficiently well informed about HIV and/or AIDS to put him on notice that he should at least investigate the existence of a cause of action where he learns of the possibility of HIV infection. After all, no real scientific knowledge is required. All a plaintiff need know is that he may have an HIV infection, that such an infection has serious consequences, and that someone else may be responsible for causing his infection.
Finally, we find as did the trial court that the record does not support a finding that any actions on the part of any of the defendants prevented the plaintiffs from asserting their various claims in a timely manner.

CLASS ACTION CROSS-JURISDICTIONAL INTERRUPTION OF PRESCRIPTION
The trial court rejected the plaintiffs' arguments that prescription was interrupted by the filing of certain out-of-state federal class actions: "Cross-jurisdictional theories are not recognized in our jurisprudence as yet and the defendants advance valid points (which this Court embraces) for not applying same in the case at bar." In the context of the trial court's reasons for judgment we read this statement as being limited to cross jurisdictional class actions. We do not interpret this statement as being intended to suggest that the trial judge was not cognizant of the fact that normally the filing of a suit in a court of competent jurisdiction interrupts prescription. We are saying no more than that in the absence of clear Louisiana precedent to the contrary, based on the deference owed by each tier of our judiciary to the others under our three tiered court system, we should defer to the decision of the trial court on this issue based on the specific facts of this case facts which lead this Court to agree with the result reached by the trial judge more because of what we view as plaintiff's attempt to "stack" class actions rather than a reliance by this Court on a rejection of theories of class action cross-jurisdictional interruption of prescription under LSA-C.C. art. 3462.
The leading case on this issue is American Pipe & Const. Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). American Pipe held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Id., 414 U.S. at 554, 94 S.Ct. at 766. But American Pipe did not involve a multiplicity of class actions filings such as are urged upon this Court by the plaintiffs in the instant case.
Wadleigh v. Rhone-Poulenc Rorer, Inc., 157 F.R.D. 410, 93-C-5969 (N.D.Ill.1994), mandamus granted, Matter of Rhone-Poulenc Rorer, Inc. 51 F.3d 1293, 1296 (7 Cir.1995), cert. den, sub nom, Grady v. Rhone-Poulenc Rorer, Inc., 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995) was a class action filed in Illinois on September 29, 1993. By that time Kenneth's claim had prescribed, and along with it any survival action. The only question is whether Wadleigh might save the wrongful death action. However, on March 16, 1995, prior to the defendant's death, the class was ordered decertified. Matter of Rhone-Poulenc Rorer, Inc. 51 F.3d 1293, 1296 (7 Cir.1995), cert. den., 516 *409 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995).[10]
Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1382 (11 Cir.), cert. den., 525 U.S. 1019, 119 S.Ct. 545, 142 L.Ed.2d 453 (1998), found that "the tolling of the statute of limitations ceases as soon as the district court denies class certification." The Armstrong opinion also states that:
[R]eliance on the possibility of a reversal of the court's certification decision is ordinarily not reasonable. We therefore conclude that continued tolling of the statute of limitations after the district court denies class certification is unnecessary to protect any reasonable [emphasis original] reliance by putative class members on their former class representatives.
Id. at p. 1381. Based on this reasoning, to the extent that prescription may have been interrupted by the 1993 filing of Wadleigh, that interruption ceased on March 16, 1995 when the Federal Appeals Court issued the mandamus to the district court to decertify the Wadleigh class. At the very latest, prescription began to run again when the district court judge (Grady) actually entered the order of decertification in January of 1996. Plaintiffs' wrongful death claim was not filed until more than a year later, in March of 1997.
Walker v. Bayer Corporation, 96-C-5024 (N.D. Ill.), filed on August 14, 1996, was a class action that initially included the plaintiffs. A settlement agreement was reached which included a tolling of the limitations periods on causes of action not already expired by otherwise applicable limitation periods as of April 19, 1996, which tolling was to operate from that date until the date a plaintiff opted out of the class. Plaintiffs in the instant case opted out of the class on October 16, 1996. The agreement purporting to toll the periods of limitation will not be recognized by courts of this state. LSA-C.C. art. 3471 states:
"A juridical act purporting to exclude prescription, to specify a longer period than that established by law, or to make the requirements of prescription more onerous, is null"
Assuming for purposes of argument that Walker suspended the running of prescription as to the plaintiffs, when they opted out of the Walker class, it was as though prescription had never been interrupted. LSA-C.C. art. 3463.
Alvarez v. Armour Pharmaceutical Co., 94-0649 (E.D. La.), a putative nationwide class action was filed on February 24, 1994. On May 24, 1994, it was transferred from the United States District Court for the Eastern District of Louisiana to Judge Grady in the Northern District of Illinois as part of MDL-986. On November 3, 1994 (before plaintiff's death), Judge Grady issued an order denying class certification in any MDL-986 case. This broad language would include Alvarez. Any arguable effect that Alvarez could have had on prescription in the instant case ended at that time, long before plaintiff's wrongful *410 death claims arose upon the death of their son in the following year.
Thorne v. Alpha Therapeutic Corp., 95-3425 (E.D. La.), was filed on October 18, 1995. It was transferred to MDL-986 on February 7, 1996. The standing MDL Case Management Order, Pretrial Order No. 2, dated May 5, 1994 states that all subsequently issued orders shall apply to each subsequently filed case unless such subsequently issued order provides otherwise. Therefore, the November 3, 1994 order referred to in the previous paragraph denying class certification would automatically apply to Thorne.
Finally, we find that the multiplicity of class action filings relied on by the plaintiffs results in just such a "stacking of class actions" as was criticized and rejected by Basch v. Ground Round, Inc., 139 F.3d 6 (1 Cir.), cert. den. 525 U.S. 870, 119 S.Ct. 165, 142 L.Ed.2d 135 (1998):
Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely. Permitting such tactics would allow lawyers to file successive putative class actions with the hope of attracting more potential plaintiffs and perpetually tolling the statute of limitations as to all such potential litigants, regardless of how many times a court declines to certify the class. This simply cannot be what the American Pipe rule was intended to allow, and we decline to embrace such an extension of that rule. At least one of our sister circuits agrees. See Salazar-Calderon v. Presidio Valley Farmers Ass'n, 765 F.2d 1334, 1351 (5th Cir.1985) ("plaintiffs have no authority for their contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely, nor have we found any."). On closely related issues, each court of appeals to address the question has reasoned similarly and rejected efforts by late plaintiffs to resuscitate their claims through the stacking of subsequent class actions.
LSA-C.C. art. 3462 was not intended to interrupt prescription where the stacking of class actions is concerned. Any class action interruption of prescription in favor of the plaintiffs should be limited to Wadleigh. As plaintiffs failed to bring their wrongful death claim in the instant action within a year after the interruption attributable to Wadleigh had ceased, plaintiffs have no class action basis for maintaining the viability of their wrongful death claims.

RELATION BACK
Plaintiffs contend that the wrongful death claims of Kenneth's parents should relate back to the filing of his original petition, citing Giroir v. South La. Medical Center, 475 So.2d 1040 (La.1985). In Giroir the decedent died on March 20, 1980. Her husband timely filed a petition asserting survival and wrongful death claims on March 13, 1981. Ten days later, or one year and three days after the death of Mrs. Giroir, an amended petition was filed adding two major children of the decedent as additional plaintiffs on both the survival and wrongful death claims. The Giroir court allowed those claims to relate back to the time of the filing of the original petition. Giroir is inapplicable to the instant case for a number of reasons. In Giroir the original petition was timely filed. In the instant case we have determined that the original petition was filed several years too late. Moreover, when Giroir allowed the wrongful death claims of the decedent's children to relate back to the filing of the original petition, those wrongful death claims were in existence at the time of the filing of the original petition. We cannot help but observe that it seems strange to contemplate the relation back of a claim or cause of action to a time prior to the time at which the claim or cause of action came into existence. By *411 way of analogy see Walls v. American Optical, 98-0455 (La.9/8/99); 740 So.2d 1262.[11]
Findley v. City of Baton Rouge, 570 So.2d 1168, 1170 (La.1990), quoted at page 10 of plaintiffs' brief refers to an "original timely pleading." In Scott v. Haley, 632 So.2d 793 (La.App. 1 Cir.1993), the original petition was filed on September 11, 1991, which was less than a year after both the surgery complained of (September 20, 1990) and the death of the decedent which occurred on January 23, 1991. The original petition, filed by the survivors of the decedent referred to both the surgery and the death of the decedent. The amendment was filed by the same parties as the original petition. Thus in Scott there are several factors favoring the doctrine of relation-back that do not exist in the instant case: 1) a timely filed original petition; 2) the same parties that filed the original petition filed the amendment; 3) the death of the decedent was referred to in the original petition; and 4) the Scott court was not being asked to relate the wrongful death claim back to a time prior to the time it arose.
Moore v. Gencorp., 93-0814 (La.3/22/94); 633 So.2d 1268, 1272, also refers to a "timely-filed suit." Likewise, Burrier v. Malmac Energy Corp., 592 So.2d 1370, 1372, (La.App. 2 Cir.1992), refers to "the original timely pleading." In Allstate Ins. Co. v. Theriot, 376 So.2d 950, 952, (La. 1979), the court referred to "the timely filed principal action." In Nini v. Sanford Brothers, Inc., 276 So.2d 262, 264 (La. 1973), the original petition was timely, and the court stated:
When the defendant knows or should know prior to the expiration of the prescriptive period that legal demands are made upon him from the occurrence described in the petition filed, prescription is interrupted. [Emphasis added.]
The highlighted language just quoted refers to formal legal demands made prior to the expiration of prescription. It is far more than mere knowledge that a claim is possible or even likely. If mere knowledge of an occurrence that could result in a timely action were sufficient to interrupt prescription, most causes of action would be imprescriptible. Again, in the instant suit the original petition was filed after prescription had run on all causes of action asserted in that petition. Nini does not support the plaintiffs' position.
LSA-C.C.P. art. 1151 provides for amended petitions and answers. The concept of relation back is based on LSA-C.C.P. art 1153:
When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in forth in the original pleading, the amendment relates back to the date of filing the original pleading. [Emphasis added.]
*412 LSA-C.C.P. art. 1155 provides for supplemental pleadings:
The court, on motion of a party, upon reasonable notice and upon such terms as are just, may permit mover to file a supplemental petition or answer setting forth items of damage, causes of action or defenses which have become exigible since the date of filing the original petition or answer, and which are related to or connected with the causes of action or defenses asserted therein. [Emphasis added.]
In Gaines v. Bruscato, 30,340, p. 8 (La. App. 2 Cir. 4/8/98); 712 So.2d 552, 557-558, writ den. 98-1272 (La.6/26/98); 719 So.2d 1059, declares that there is distinct difference between supplemental pleadings and amended pleadings:
A supplemental pleading differs from an amended pleading in that an amended pleading involves matters which occurred before the original complaint was filed and which were either overlooked by the pleader or were unknown to him at the time, while a supplemental pleading covers issues or causes of action which have arisen since the filing of the original petition, which relate to the issues or actions contained in the original petition. Adema v. Elliott, 223 So.2d 464 (La.App. 4th Cir.1969). [Emphasis added.]
The distinction drawn by Gaines[12] between supplemental pleadings and amended pleadings is consistent with the language of LSA-C.C.P. art. 1151-1155. However, this distinction, which appears to have been largely overlooked by the courts, raises further problems for plaintiffs' attempt to have their wrongful death claim relate back to the filing of their son's original petition. LSA-C.C.P. art. 1153 which provides for relation back refers only to amended petitions, not supplemental petitions. LSA-C.C.P. art. 1153's positioning in the Code lends further support to the conclusion that the provisions of LSA-C.C.P. art. 1153 are intended to apply to amended petitions, not supplemental petitions.
In the instant case, the plaintiffs' wrongful death action (which plaintiffs have strenuously argued did not arise until the date of the death of the plaintiffs' son Kennethan argument consistent with the jurisprudence and the opinion of this Court), in the language of LSA-C.C.P. art. 1155 describing supplemental petitions, became "exigible since the date of filing the original petition ..." The legal effect of this is that plaintiffs' wrongful death action was asserted in a supplemental petition, not an amended petition, regardless of how it was styled or captioned. Accordingly, plaintiffs petition cannot relate back under LSA-C.C.P. art. 1153, as 1153 applies only to amended petitions. This reading of the Code articles is not only in conformity with the clear language and placement of those articles, it also comports more reasonably with the rules of logic: As supplemental petitions deal with "causes of action ... which have become exigible since the date of filing the original petition" it would be illogical to permit them to relate back to a filing that occurred prior to the time the cause of action arose. Pursuant to this analysis, we reach the inescapable conclusion that when the legislature failed to provide for the relation-back of supplemental petitions it was not through oversight, but through reason. It is significant that in the landmark case of Giroir, supra, the wrongful death claim that was allowed to relate back had accrued prior to the time of the filing of the original petition, consistent with the description in Gaines of the distinction between amended and supplemental petitions.
However, we acknowledge that in Esteve v. Iberia Parish Hosp., 520 So.2d 848 (La. App. 3 Cir.1987), writ den. 522 So.2d 561 (La.1987), the court allowed a wrongful *413 death claim by the decedent's husband to relate back to an original petition filed prior to the death of the decedent. But we note that in Esteve the original petition was timely filed. Moreover, the husband in Esteve was already a named plaintiff in the original petition. No new parties were added in Esteve. More significantly, we note that in Esteve neither the parties nor the court seemed to advert to the significance of the fact that the wrongful death claim should have been treated as a supplemental claim rather than a claim added by amendment. Therefore, while plaintiffs may derive some comfort from Esteve on the issue of supplemental versus amended petition, Esteve goes against the plaintiff on the question of the timeliness of the original petition. Ultimately, we hold that an untimely filed original petition does not support the relation-back of a new cause of action asserted by new parties.

THE JURY VERDICT
As we have fully disposed of this case on the basis of prescription, there is no need to discuss assignments of error related to the jury verdict and the conduct of the trial.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] This Court recognizes the redundancy here in that the "V" in HIV stands for "virus."
[2] Gamberella was cited and followed by this Court in State v. Serrano, 97-0923 (La.App. 4 Cir. 6/17/98); 715 So.2d 602.
[3] This is consistent with the testimony of Dr. Meyer, an expert who worked in the field of public health for many years:

So there was a great effort during that period to continually disseminate, and in doing that, each of the components of the Public Health Service, starting with the office of the secretary, well, the Health and Human Services, press releases, had a series of publications, press releases, news releases, even a hot line at which a person could call in and ask questions. So, there's just an enormous list of documents that went out to the public about AIDS.
Q. What efforts were, if any, were made during this time frame and again, we're talking late '82 throughout '83, what efforts, if any, were made by representatives of the government to go and get the word out?
A. A great deal of effort. For example
Q. What types of effort in that regard?
A. Well, I'm thinking of individual efforts, like the secretary of Health and Human Service or the assistant secretary for Health giving press briefings and things of that sort. I can think of people like Dr. Curran, who was one of the lead epidemiologists on AIDS at the CDC, appearing on national television programs to discuss what we knew and what issues were. Hemophilia came up on that. I can think of members of the staff of the Centers for Disease Control, of other government agencies, attending meetings like the Hemophilia Foundation to keep them continually updated on new information.
Q. What was theare you referring to the National Hemophilia Foundation?
A. Yes, sir.
Q. To your knowledge, based upon your role in the evolution of this disease we now know as AIDS, were representatives of the governmentcan you tell us whether or not representatives of the government were advising the National Hemophilia Foundation about this evolving disease?
A. I'm not sure I would necessarily use the word "advise," but I'm certainly aware that the staff member of the Centers for Disease Control was the regular liaison person at the meetings for the hemophilia scientific group making them completely updated on the most recent information about the spread of AIDS, AIDS epidemiology, cases in hemophilia, just as the CDC to the advisory committees I have was sending a regular liaison man to be able to answer questions and to help continually update us. This was done tofor many professional organizations.
* * * * * *
A. From my experience in public health, after thirty years or more in public health, I would say that you were learning more about something unprecedented and new and coming to grips with that information, disseminating information and trying to do something about it than anything I've seen in my time in public service. [Emphasis added.]
[4] Emphasis added.
[5] See also Vallery v. Southern Baptist Hospital, 630 So.2d 861 (La.App. 4 Cir.1993), writ den. 94-0249 (La.3/18/94); 634 So.2d 860.
[6] Another example of an interchangeable reference to HIV.
[7] This same language was quoted in Quick v. Aetna Cas. & Sur. Co., 347 So.2d 59, 61 (La. App. 2 Cir.1977); writ den. 350 So.2d 889 (La.1977).
[8] Infection with HIV.
[9] Mr. Dixon was a trustee of the Louisiana Hemophilia Foundation from 1983 to 1985. At various times he was on the fund raising committee and in 1989 he was on the nominating committee. In 1988-1989. Mrs. Dixon was region IV vice-president of the Louisiana Hemophilia Foundation.
[10] Consistent with what this Court has found to be the state of knowledge concerning HIV and AIDS at all times relevant to this case, the Federal Appeals Court in Rhone-Poulenc Rorer, Inc. found that: "Unless there are dramatic breakthroughs in the treatment of HIV or AIDS, all infected persons will die from the disease." Id. at p. 1296. The Federal Appeals Court also stated that:

"The blood supply has been safe since 1985. That is ten years ago. The risk to hemophiliacs of having become infected with HIV has been widely publicized; it is unlikely that many hemophiliacs are unaware of it. Under the usual discovery statute of limitations, they would have to have taken steps years ago to determine their infection status, and having found out file suit within the limitations period running from the date of discovery, in order to preserve their rights." [Emphasis added.] Id. at p. 1298.
In other words, in view of the extensive publicity surrounding the HIV risk to hemophiliacs, the Federal Court would place the burden of discovering one's HIV status on the hemophiliac. Following this line of reasoning, where a hemophiliac who does not know he is HIV positive has a duty to inquire, per force, one who already knows must assert his rights timely or lose them.
[11] We note that the Supreme Court in Walls made the sweeping statement that "the wrongful death action is an independent and distinct action that arises even in the absence of a viable personal injury action by the direct tort victim and compensates the beneficiaries for their own individual injury arising out of the victim's death." Id. 740 So.2d at p. 1274. This would mean that where the direct tort victim fails to bring a timely claim for his own injuries, his survivors still have one year from the date of his death in which to bring a wrongful death claim. The Walls language would appear to be broad enough to allow the survivors to assert a wrongful death claim even in those instances where the decedent may have given a full settlement and release to the tort feasor prior to his death. The Walls language is also literally broad enough that res judicata would not apply where a judgment against the decedent was rendered prior to death. Query: Where the direct tort victim is a major, should his ability to settle his claim on the terms most advantageous to himself as the party most directly affected by the tort be impeded by the potential but somewhat unquantifiable interests of a class of survivors that cannot be determined with certainty until the death of the decedent, a death that may come about through some unpredictable intervening cause. Practitioners should be alert to the potential for problems in this area.
[12] Abrams v. Dinh, 471 So.2d 994 (La.App. 1 Cir.1985) and Royer v. St. Paul Fire & Marine Ins. Co., 502 So.2d 232 (La.App. 3 Cir.), writ den. 503 So.2d 496 (La.1987) also note the distinction between amended petitions and supplemental petitions.