874 So.2d 228 (2004)
BARHAM & ARCENEAUX
v.
Charles KOZAK and Mull & Mull (a Louisiana Partnership).
No. 2002 CA 2325.
Court of Appeal of Louisiana, First Circuit.
March 12, 2004.
*231 Bruce S. Kingsdorf, Barrios, Kingsdorf & Casteix, L.L.P., New Orleans, for Plaintiff-in-Cross-Claim/Appellee Mull & Mull, A Louisiana Partnership.
Frank Tomeny, III, Jason L. Melancon, Tomeny & Fisher, Baton Rouge, for Defendant-in-Cross-Claim/Appellant Charles Kozak.
Before: PARRO, McDONALD, and CLAIBORNE,[1] JJ.
PARRO, J.
This case involves a fee dispute among multiple attorneys. An attorney appeals from a judgment dividing fees between him and a law firm on a quantum meruit basis pursuant to an oral fee-sharing agreement, and ordering him to pay 80 percent of the court costs. In its answer to the appeal, the law firm seeks modification of the trial court judgment. For the following reasons, we reverse in part, affirm in part, and render.

Factual and Procedural History
At a time when there was nationwide litigation concerning defective blood products that transmitted HIV[2] and other diseases to hemophiliacs, the Louisiana law firm of Mull & Mull (M & M) provided legal services to Gary Cross, whose son Bradley was a Louisiana hemophiliac infected with AIDS[3] from using such products. In 1993, to assist with the trial of the Cross case, M & M engaged Charles Kozak (Kozak), a sole practitioner licensed to practice law in Hawaii, who had experience in representing clients with similar claims and was familiar with the scientific principles underlying such claims. M & M agreed to share with Kozak ten percent of the attorney fees recovered in the Cross case; however, M & M did not achieve a favorable outcome and no attorney fees were recovered.[4]
Subsequently, because Kozak perceived that at that time, Louisiana's strict product liability laws created a favorable forum for such cases, Kozak associated with M & M concerning 49 HIV-positive hemophiliacs from California (Alvarez 49). On these cases, Kozak and M & M orally agreed to divide attorney fees on a 50/50 basis. Meanwhile, as M & M's involvement in AIDS-hemophiliac cases became known, it began to sign on many other non-Louisiana clients who came directly to it for representation. The contingency fee contracts with most of these clients identified M & M and Kozak as co-counsel, but did not discuss how the attorney fees would be divided between counsel. M & M and Kozak also had separate cases that were exempt from any fee-sharing between them.
In 1994, hundreds of AIDS-hemophiliac cases were consolidated into a multi-district *232 class action in the federal district court in Chicago, Illinois. Kozak and M & M represented a group of plaintiffs, including the Alvarez 49, in the Chicago proceedings. The defendants were four huge pharmaceutical companies that produced the "fractionated" products used to reduce bleeding in hemophiliacs. Kozak and Thomas Mull (Mull) of M & M also served on the plaintiffs' steering committee (PSC) until May 1997. The defendants in the Chicago proceedings eventually filed a petition seeking decertification of the litigation class, which was granted by the United States Seventh Circuit Court of Appeals in January 1996. Nonetheless, a settlement class remained in existence, and eventually a $600 million global settlement was negotiated with the defendants by the PSC. In connection with the global settlement, a $40 million attorney fee fund was created to compensate the attorneys who had represented the various plaintiffs. M & M and Kozak individually or jointly represented over 400 clients on a contingency fee basis, over 300 of whom agreed to "opt-in" to the global settlement.
Based on their desire to continue with the litigation of their cases, more than 100 of M & M's clients opted-out of the global settlement; between 70 and 90 of these were non-Louisiana residents whose claims were filed in Baton Rouge, and another 15 cases involving Louisiana residents were filed in Orleans Parish.[5] Rather than pursuing all of the opt-out clients' cases simultaneously, the plaintiffs' team agreed to focus on one of the cases in Orleans Parish to establish a model case. Kozak had no financial interest in the chosen case, but agreed to assist in the trial preparation of this matter because of its importance to the litigation or settlement of the other pending cases in which he did have a financial interest.[6] In May 1999, after months of trial, the jury in the model case returned a $35 million judgment in favor of the plaintiff; however, the trial court granted a pending exception raising the objection of prescription and dismissed the case.[7] In October 2000, the plaintiffs' team finally negotiated a settlement covering most of the opt-out cases.
Meanwhile, for the opt-in cases in Chicago, the federal district court approved the global settlement structure and attorney *233 fee fund procedure in 1997, but abrogated all contingency fee contracts. At this point, M & M and Kozak jointly hired Robert Arceneaux (Arceneaux) of Barham & Arceneaux (B & A) to pursue their fee interests in those cases. In a written agreement dated September 23, 1997, M & M and Kozak agreed to split B & A's invoiced fees and costs on a fifty/fifty basis, with litigation costs to be reimbursed monthly, but no fee payments until recovery of settlement proceeds for the opt-in clients. Their appeal and a consolidated mandamus petition concerning the contingency fees were denied by the Seventh Circuit in October 1998. Following that decision, Kozak terminated the services of B & A, who continued to represent M & M and filed a petition for certiorari with the United States Supreme Court.
The Supreme Court ultimately denied the writ application concerning the contingency fee agreements, leaving the attorney fees to be negotiated with the PSC, subject to the approval of the federal district court. B & A handled the negotiating process with the PSC on behalf of M & M, and eventually, the PSC agreed to recommend to the court that M & M and Kozak be paid a total of $2.5 million from the attorney fee fund. In May 2000, immediately preceding a fee hearing before the federal district court, M & M entered into an agreement with Kozak (the Chicago Agreement), agreeing to divide the attorney fees approved by the court on the basis of two-thirds to M & M and one-third to Kozak. M & M and Kozak further agreed that with the money each received, each would pay one-half of the fees for services rendered by B & A through the date of Kozak's termination of B & A in November 1998.[8] The court approved the $2.5 million for M & M's and Kozak's fees related to the opt-in cases.[9] Although M & M and Kozak had confirmed in open court that they had an agreement regarding the division of the fees, immediately after they left the hearing, Kozak claimed he did not understand the terms of the Chicago Agreement. Kozak insisted that Arceneaux had misled him into believing that the fee would be computed in such a way that his recovery, after payment of expenses and B & A's attorney fees, would be $912,000. Accordingly, Kozak refused to permit the PSC administrator to disburse funds for B & A's attorney fees and costs, which resulted in B & A's filing of this suit against M & M and Kozak in August 2000.
Kozak answered and filed a reconventional demand against B & A for tortious interference with contract, bad faith breach of contract, legal malpractice, breach of fiduciary duty, and conflict of interest, seeking damages and disgorgement of any attorney fees he had already paid to B & A for its legal services in the Chicago fee litigation.[10] In its answer, M *234 & M basically acknowledged all of B & A's claims and further stated it had paid all of B & A's costs as billed and had made a partial payment of $96,830 to B & A for the post-November 1998 portion of the attorney fees. In a cross-claim against Kozak, M & M claimed he had breached the contract they had jointly entered into with B & A, and in the event M & M were held solidarily liable with Kozak for the amounts still due to B & A, sought contribution from him for the portion of those fees and costs that he owed. M & M also sought damages arising from Kozak's breach of the Chicago Agreement, a judgment declaring all M & M's and Kozak's attorney fee agreements null and void as a result of Kozak's breaches of contract, and a declaratory judgment re-allocating the fees between M & M and Kozak on a quantum meruit basis. M & M further sought forfeiture of or a reduction in Kozak's fees for his alleged breaches of contract concerning the opt-out cases, as well as damages for tortious interference with M & M's contractual relationships with the opt-out clients. Kozak answered the M & M cross-claim, but did not assert a cross-claim against M & M.
After a five-day trial, the court entered a judgment in favor of B & A on its principal demand and dismissed Kozak's reconventional demand. The court also ruled in favor of M & M on most of its cross-claims. Concerning the division of attorney fees between M & M and Kozak, the trial court stated, in pertinent part:
There is no doubt that at the outset of the relationship between Mull and Mull and Kozak, the two were going to split fees, expenses and costs on a 50/50 basis. Kozak claims that always remained the case. Mull claims that everyone recognized the disparity in work, overhead and costs expended and that the two agreed to an equitable allocation under quantum meruit. This is a credibility determination since the two positions are clearly opposing. The Court is unimpressed with the credibility of Charles Kozak. The Court is of the opinion that Kozak was an eccentric who labored under illusions of grandiosity. When forced back to earth by reality, there was always an excuse.... Once the trier of fact gets to the bottom line on whether this is a 50/50 split or a quantum meruit allocation, Kozak expects the Court to believe him despite the testimony of 1). Tom Mull, 2). Lori Mull, 3). Leslie Grisham, 4). Michael Baum and 5). Robert Arceneaux. Kozak's position that the case of [Rice, Steinberg and Stutin, P.A. v. Cummings, Cummings and Dudenhefer, 97-1651 (La.App. 4th Cir.3/18/98), 716 So.2d 8, writ denied, 98-1328 (La.6/26/98), 719 So.2d 1288,] mandates a 50/50 split is an improper interpretation of the decision. In that case, the agreement was 50/50 and there was no evidence it had changed. It was alleged that one side did more than the other. In this case, the Court finds the parties mutually consented to the change to a quantum meruit allocation of the fees. This is certainly permissible under Rice.

As to the Opt-Ins ..., the agreement entered into in Chicago in May, 2000 is valid and enforceable. This Court just does not believe that an attorney after negotiations and a colloquy with the Judge can seriously claim duress or error. Mr. Kozak's claim that he thought (and Arceneaux told him) that he'd get $912[,]000 is incredulous. How could *235 one think he'd net more tha[n] he grossed? This is an attorney practicing extensively in the field of tort law and very familiar with contingent fees. The Court finds the "Chicago Agreement" to be valid and that out of the remaining funds with the PSC member, $558,333.33 is allocated to Kozak and the remainder to Mull and Mull (subject to the lien recognized in favor of Barham and Arceneaux).
As to the remaining [opt-out] cases (approximately 90) the Court applies the quantum meruit doctrine which it finds to have been the agreement of the parties. The Court is of the opinion that the overwhelming work and expense sharing was borne by Mull and Mull. The work of Kozak was intermittent. The listing of Kozak in his brief as to his work is not impressive and overstated at best. The emphasized statement "Therefore, Kozak could reasonably argue that he rather than Mull and Mull `provided more skill and/or labor' to the overall litigation effort" is without a scintilla of merit. However, Mull and Mull's contention that the quantum meruit should be further reduced by alleged breaches is without merit. Certainly, the parties were not plowing together down the same row. However, Mull and Mull knew of the actions of Kozak and, with such knowledge, continued in the relationship. Mr. Mull's testimony that they were too busy to deal with it does not justify the Court to ignore the continuance of the relationship. The Court finds that any contractual relationship between the parties (and Baum, Hedlund) ended with the letter of March 1, 2000 and Kozak's response to the letter of having a meeting with clients in San Francisco thereafter. The quantum meruit allocation between Kozak and Mull and Mull, taking into account the amount and value of work to these cases through the dissolution of the relationship, is 15% to Kozak and 85% to Mull and Mull. The fees subject to such distribution on the 90 cases [are] $8,833,435.37. Therefore, $1,325,015.21 is payable to Kozak and $7,508,420.16 is payable to Mull and Mull.
As to the other cross-claims by M & M against Kozak, the trial court found that any interference with contract was after the fiduciary relationship between M & M and Kozak had ended. The trial court observed that the letter terminating their relationship in March 2000 seemed to invite the warfare that erupted, and advised that even if a tort had been proven, no damages were shown. After recognizing that M & M and Kozak were both cast in judgment on B & A's principal demand, the trial court ruled that an equitable assessment of the costs of trial would be eighty percent to Kozak and twenty percent to M & M.
Kozak appealed only the rulings on the M & M cross-claims against him, urging that the trial court erred in:
1. failing to require a written "side agreement" modifying the contingency fee contracts on which both attorneys' names appear, and instead finding an oral agreement to divide fees on a quantum meruit basis;
2. failing to find that M & M violated Louisiana partnership law by admitting B & A as a new partner to the joint venture on the non-Louisiana opt-out clients' Baton Rouge cases and alienating a portion of Kozak's interest in those cases without his knowledge or consent;
3. apportioning only fifteen percent of the attorney fees to Kozak in the opt-out cases; and
4. allocating eighty percent of the court costs to him.
*236 M & M answered the appeal, contending the trial court erred in failing to find that Kozak breached the Chicago Agreement by refusing to pay B & A. As damages for that breach, M & M seeks to recover the legal interest it was ordered by the trial court to pay to B & A. In the event Kozak convinces this court to disturb the 85/15 percent allocation of attorney fees, M & M submits that the trial court erred in failing to find that:
1. Kozak breached his contract with M & M to represent the interest of their mutual clients in the opt-out cases,
2. Kozak's actions warranted the dissolution of the agreements between Kozak and the rest of the plaintiffs' team, and
3. Kozak was properly expelled from the joint venture with M & M and the rest of the plaintiffs' team for just cause.
M & M argued that Kozak's violations of his fiduciary responsibilities to co-counsel and bad faith breaches of contract rendered null and void any entitlement Kozak might have had to recover any attorney fees under his agreements with M & M. M & M also seeks a determination that Kozak's actions constituted intentional interference with the contracts between M & M and the opt-out clients, justifying an award of damages.

Applicable Law on the Division of Fees Between Co-counsel
When professional contracts between attorneys who agree to share legal fees are at issue, Louisiana courts have generally refrained from examining them to determine whether one attorney performed more work than the other. See Rice, Steinberg, & Stutin, P.A. v. Cummings, Cummings & Dudenhefer, 97-1651 (La.App. 4th Cir.3/18/98), 716 So.2d 8, 12, writ denied, 98-1328 (La.6/26/98), 719 So.2d 1288. A joint venture theory was used by the court in McCann v. Todd, 203 La. 631, 14 So.2d 469 (1943), to resolve an attorney fee division dispute where the attorneys had jointly undertaken to represent their client in a lawsuit. The court in McCann recognized that, absent an agreement to the contrary, the attorneys are entitled to share equally in the compensation. In such a case, the amount of time and labor furnished by the two attorneys is immaterial to the division of fees. McCann, 14 So.2d at 472.
The courts have continued to apply the joint venture theory to uphold an agreement to share fees where two attorneys have executed a single contingency fee contract with the client. In such cases, the finding of a joint venture has been based on the fact that neither attorney has been discharged and both were actively involved in the case and remained responsible to their client. See DeFrancesch v. Hardin, 510 So.2d 42, 45 (La.App. 1st Cir.), writ denied, 513 So.2d 819 (La.1987); see also Krebs v. Mull, 97-2643 (La.App. 1st Cir.12/28/98), 727 So.2d 564, 569, writ denied, 99-0262 (La.3/19/99), 740 So.2d 119; Rice, Steinberg, & Stutin, P.A., 716 So.2d at 11; Fontenot & Mitchell v. Rozas, Manuel, Fontenot & McGee, 425 So.2d 259, 260 (La.App. 3rd Cir.1982), writ denied, 432 So.2d 268 (La.1983). Relying on DeFrancesch, the court in Rice, Steinberg, & Stutin, P.A., held that a single contingency fee was to be divided equally between the two lawyers or firms, rather than on a quantum meruit basis, where two lawyers or firms had executed a single contingency fee contract, neither was discharged, and both were involved in the case through its conclusion. Rice, Steinberg, & Stutin, P.A., 716 So.2d at 14.
In Scurto v. Siegrist, 598 So.2d 507 (La.App. 1st Cir.), writ denied, 600 So.2d 683 (La.1992), two attorneys had entered into an agreement to divide the legal fees on a one-third/two-thirds basis. Scurto, the attorney *237 who sought to recover his two-thirds share of the contingency fee, was obligated by the agreement to manage the client and to advance costs. Scurto was actively and continually involved with the case by frequently communicating with the client, advancing all expenses he was requested to pay, researching jurisprudence and statutory law, and attending depositions on behalf of his client. Scurto, 598 So.2d at 510. This court found that the attorneys were in a Duer situation, that is, two attorneys not of the same firm jointly representing a client.[11] Because the retained attorney had associated, employed, or procured the employment of the other attorney to assist him in handling a case involving a contingency fee and had agreed to divide that fee, their relationship was a joint venture. Scurto, 598 So.2d at 510. This court further indicated that with a Duer arrangement, the Rules of Professional Conduct did not prohibit the enforcement of an agreement dividing the contingency fee and would not require the apportioning of the fee on a quantum meruit basis. Scurto, 598 So.2d at 510. Accordingly, the agreement between the attorneys to divide fees on a one-third/two-thirds basis was held to be valid and enforceable. Scurto, 598 So.2d at 510. Where the attorneys have otherwise agreed, their agreement governs the division of fees unless there was a breach of that agreement due to a party's failure to fulfill his obligations in representing the client. See Brown v. Seimers, 98-694 (La.App. 5th Cir.1/13/99), 726 So.2d 1018, 1022-23, writ denied, 99-0430 (La.4/1/99), 742 So.2d 556; Rice, Steinberg, & Stutin, P.A., 716 So.2d at 14.
The phrase, quantum meruit, means "as much as he deserved." It encompasses far more than simply the hours spent by the attorney on his client's case, and includes the ultimate results obtained as well as the particular benefit to the case derived for each unit of time devoted to the case. Smith v. Westside Transit Lines, Inc., 313 So.2d 371, 378 (La.App. 4th Cir.), writ denied, 318 So.2d 43 (La.1975); Matter of P.E. Boat Rentals, Inc., 928 F.2d 662, 664 (5th Cir.1991).

Division of Fees
Relative to all the opt-out clients in whose contingency fee contracts Kozak was listed as co-counsel with M & M, Kozak maintains that by listing him as co-counsel, M & M agreed to a joint venture in which attorney fees would be divided equally, regardless of the amount of work performed by each. Kozak argues the trial court erred in failing to require a written "side agreement" modifying the written contingency fee agreements, and asserts the court should have required a higher burden of proof to establish the oral contract. He also contends a written agreement was necessary to modify the terms of their original oral agreement to divide fees equally. In the event this court agrees that M & M and Kozak had orally contracted to split the attorney fees on a quantum meruit basis, he argues the trial court abused its discretion by allocating only fifteen percent of those fees to him and assessing him with eighty percent of the costs.
We address first Kozak's contention that the trial court should have required more proof of the oral contract in order to satisfy the requirements of Louisiana Civil Code article 1846. To prove the existence and terms of an oral contract with a value exceeding $500, Article 1846 requires the *238 testimony of at least one credible witness and other corroborating circumstances. The court in this case found Mull was a credible witness; his testimony concerning an oral agreement to divide the attorney fees on the basis of quantum meruit was corroborated by several other witnesses whom the court found were also credible. Kozak's argument that the evidence fails to meet the requirements of Article 1846 is without merit. We note also that the contingency fee agreements themselves did not specify how the attorney fees would be divided, obviating the need for a written "side agreement" or other written document modifying the unwritten terms of their joint undertaking to represent their clients.
Much of the jurisprudence addressing fee disputes between attorneys involves situations in which one or more of the attorneys have been discharged by the client and the court must allocate the contingency fee. See, e.g., Saucier v. Hayes Dairy Prod., Inc., 373 So.2d 102 (La.1978); O'Rourke v. Cairns, 95-3054 (La.11/25/96), 683 So.2d 697. That is not the situation involved in this case. Other cases address circumstances in which the court finds that the attorneys never reached an agreement concerning the method of dividing a contingency fee and, in the absence of an agreement to the contrary, the courts applied the joint venture theory and divided those fees equally. See, e.g., McCann, 14 So.2d 469 and progeny. That is also not the situation before us. In this case, the trial court found that the attorneys commenced their endeavor intending to split the attorney fees equally, but soon modified that agreement to reflect the disproportionate expenditures each was actually making in time and money. Therefore, unless that factual finding of the trial court is clearly wrong, this case is more analogous to Scurto, in which a disproportionate division of fees was agreed upon by the attorneys and eventually confirmed by the court. Scurto, 598 So.2d at 510.
With respect to the Cross case, which was the first case on which M & M and Kozak cooperated, both parties acknowledged they agreed to share fees on the basis of ninety percent to M & M and ten percent to Kozak. Both parties also stated that in connection with Kozak's subsequent referral of the Alvarez 49, they initially agreed to divide the attorney fees equally. In the Chicago Agreement, they agreed to divide the fees attributable to the opt-in cases, including those that were part of the Alvarez 49, on a disproportionate basis, two-thirds to M & M and one-third to Kozak, and also agreed to a disproportionate division of the costs and B & A fee rebate. Clearly, Kozak and M & M did not consistently follow a fifty/fifty division of the contingency fees on cases in which they were jointly involved.
According to Mull, after the Alvarez 49 referrals, when hundreds of other AIDS-hemophiliac clients came to M & M for representation, Kozak suggested that both of their names be placed on the client contracts, since they would both be representing the clients, and further suggested that the division of fees be decided at a later date. Mull testified that he and Kozak clearly understood that the sharing of fees on these additional cases would differ from that initially agreed to with respect to Kozak's Alvarez 49 referrals, and would be divided equitably based on the labor and costs each contributed in handling the cases. Mull said that in early 1996, as M & M and Kozak began to sign more clients, they agreed to a quantum meruit relationship. According to Mull, their oral agreement contemplated that the following factors would be considered in dividing fees: the number of attorneys and paralegals from each law firm working on the *239 cases; the amount of time expended by each firm while working on the cases; the amount of costs paid by each firm; and the manner of referral.
In mid-1997, shortly after a Chicago hearing at which the federal district court removed Kozak and Mull from the PSC,[12] Mull, at his wife's insistence, contacted Kozak by telephone in her presence to confirm the details of their fee-splitting agreement. Mull testified that Kozak confirmed their 1996 oral agreement to share fees on a quantum meruit basis. Mull's testimony regarding this telephone conversation with Kozak was corroborated by his wife, Lorraine, who is also an attorney with M & M. She testified that Kozak's confirmation of the equitable division of fees was based on the fact that M & M was investing more resourcesmoney and manpowerand had more responsibilities for the files than Kozak. Based on her observations during the telephone conversation, the agreement seemed amicable. Mull further stated that later that year, during a break in a meeting with the new members of the plaintiffs' team on a hotel balcony in Honolulu, Kozak again acknowledged the quantum meruit arrangement. Mull's balcony conversation with Kozak was corroborated by Leslie Grisham, a Baum, Hedlund paralegal who was present at the meeting. She testified that the words "quantum meruit" were used by Mull and Kozak, prompting her to later look up the phrase in Black's Law Dictionary to confirm her understanding of its meaning. Mull acknowledged this agreement was never memorialized in writing. According to Mull, he and Kozak agreed that the quantum meruit division of fees would apply to all their joint clients, including the Alvarez 49, except for those whose fees would be subject to the authority of the Chicago federal district court.[13]
Kozak claimed the fifty/fifty agreement was applicable to all of their joint cases and had never been modified. He further stated that he and M & M had intended that their fee-sharing agreement eventually would be reduced to writing. Kozak denied discussing the sharing of fees on a quantum meruit basis in the spring of 1996, at the meeting in Honolulu, or in a May 1997 telephone conversation with Mull. Kozak explained that it was not until April 2000 that he received a call from Mull and learned that M & M was not going along with the fifty/fifty division and wanted to renegotiate the arrangement. However, despite his protestations concerning the equal split of attorney fees, Kozak himself admitted it was equitable for M & M to get more of the attorney fee fund in the Chicago opt-in cases. He was asked, "Do you remember telling Tom [Mull] in Chicago that I always thought you should get more because you did more work?" His response was, "I think I did tell him that." Although the Chicago Agreement concerned only the opt-in cases, this response undercuts Kozak's insistence that his intention was always to receive an equal share of the attorney fees, regardless of how much work each party performed on behalf of their joint clients.
Other corroborating circumstances were that Kozak did not maintain a law office and had no staff other than occasional *240 assistance from his wife. He did not contribute to any litigation expenses and, in connection with the opt-in cases, submitted no case-specific claims to the PSC to justify being paid out of the attorney fee fund. Michael Baum testified that when he tried to communicate with Kozak, he had to time his telephone calls around Kozak's golfing schedule in order to reach him. In contrast, the M & M firm had several attorneys working virtually full-time on these cases, along with paralegals and secretaries. M & M submitted hundreds of case-specific claim forms to the PSC, detailing the hours worked, firm personnel involved, and client contacts it had maintained on a case-by-case basis. Until Baum, Hedlund and Bowers, Orr were brought into the plaintiffs' team, M & M fronted all of the litigation costs, which were running at least $18,000 per month. These circumstances support Mull's contention that as the case-load increased, he and Kozak agreed to a quantum meruit division of the fees. It is simply not believable that M & M would have continued to perform the bulk of the work and incur all of the expenses, yet continue to agree to a fifty/fifty division of the attorney fees.
The contingency fee contracts reveal that, although named as co-counsel, Kozak did not execute any of the contracts. The contracts were signed only by the clients and a representative of M & M; they did not spell out how the attorneys would divide their fees. The fact that M & M and Kozak were listed as co-counsel on the written contingency fee contracts does not, in and of itself, establish that they had agreed to divide the fees equally. It establishes only that M & M and Kozak had jointly undertaken to represent these clients. Yet the evidence shows Kozak was not involved in the opt-out cases through their conclusion, and, although not formally discharged by the clients, he was advised in March 2000 by the rest of the plaintiffs' team that his services were no longer needed or wanted.
After hearing all of the testimony and observing the demeanor of the witnesses, the trial court recognized the conflict in the testimony concerning the terms of the division of fees between Kozak and M & M. The trial court clearly did not find Kozak to be a credible witness. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of Incredibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Relying on the considerable evidence presented by M & M on this issue, the trial court found the parties mutually consented to change to a quantum meruit allocation of the fees. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, 549 So.2d at 844. Giving deference to the trial court's credibility determinations and factual findings in this case, we conclude the trial court was not clearly wrong in finding that Kozak and M & M ultimately agreed to divide fees in the opt-out cases, including those originally included in the Alvarez 49, on a quantum meruit basis.

Sharing of Fees with B & A
Kozak urges on appeal that the trial court erred in failing to find that M & M violated Louisiana partnership law by *241 admitting B & A as a new partner to the joint venture with respect to the non-Louisiana opt-out cases filed in Baton Rouge. The evidence shows that after the plaintiffs' team advised Kozak in March 2000 that his services were no longer required, M & M agreed to transfer five percent of M & M/Kozak's joint fee interest in those cases to B & A. This agreement was confected in a June 13, 2000 letter agreement with the other members of the plaintiffs' team.[14] The trial court found that the contractual relationship between the other members of the plaintiffs' team and Kozak terminated with the March 2000 letter and Kozak's later solicitation of clients for himself and another law firm in San Francisco. However, the trial court judgment is silent concerning whether M & M's action violated Louisiana law concerning partnerships or joint ventures. Generally, when a judgment is silent as to a claim or demand, it is presumed that the trial court denied the relief sought. Stephenson v. Nations Credit Fin. Services Corp., 98-1689 (La.App. 1st Cir.9/24/99), 754 So.2d 1011, 1023.
However, M & M maintains that in this case the judgment was silent on this issue, not because the court denied the relief, but because Kozak never made such a claim or demand against it and never sought such relief in its pleadings. Therefore, M & M argues that this issue was not before the trial court and is not properly before this court. Kozak did not cross-claim against M & M asserting any violation of Louisiana partnership law or requesting recovery from it of the fees paid to B & A on the Baton Rouge opt-out cases. Testimony and documentary evidence regarding B & A's involvement in the Baton Rouge opt-out cases was admitted, initially in connection with the trial of B & A's main demand and Kozak's reconventional demand against B & A alleging malpractice and conflict of interest. The court found this evidence had relevance for the purpose of determining whether B & A had a conflict of interest with Kozak, such that its participation in the confection of the Chicago Agreement was suspect or might constitute malpractice. But during the trial of the principal and reconventional demands between B & A and Kozak, the evidence was admitted only over the continued objections of B & A and M & M. Later, during the trial of the M & M cross-claim against Kozak, additional evidence concerning B & A's participation in the representation of the opt-out clients was adduced. The first time the issue of a possible violation of Louisiana partnership law was raised against M & M with a request for monetary reimbursement was in Kozak's post-trial memorandum, in which he argued this position in connection with the parties' respective rights to their joint fees from the opt-out cases.
Louisiana Code of Civil Procedure article 1154 provides that when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings. If evidence is objected to at the trial on the *242 ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended. LSA-C.C.P. art. 1154. However, according to the editor's notes to Article 1154, this sentence does not contemplate the adding of an issue not pleaded, but rather allows the pleading of material facts for an issue pleaded only generally or as a legal conclusion. A timely objection to an attempt to enlarge the pleadings, coupled with the failure to move for an amendment to the pleadings, is fatal to an issue not raised by the pleadings. Barker v. Loxco, Inc., 432 So.2d 975 (La.App. 1st Cir.1983); Gar Real Estate & Ins. Agency v. Mitchell, 380 So.2d 108, 109 (La.App. 1st Cir.1979).
For introduction of evidence to automatically enlarge the pleadings under Article 1154, the evidence admitted must not be pertinent to any other issue raised by the pleadings. If the evidence was admissible for any other purpose, it cannot enlarge the pleadings without the express consent of the opposing party. Bourque v. Koury, 95-286 (La.App. 3rd Cir.11/2/95), 664 So.2d 553, 555; Snearl v. Mercer, 99-1738 (La.App. 1st Cir.2/16/01), 780 So.2d 563, 572, writs denied, 01-1319 & 01-1320 (La.6/22/01), 794 So.2d 800 & 794 So.2d 801. When a particular claim has not been alleged, even if evidence supporting that claim is admitted without objection, if that evidence has relevance to another issue, it cannot be said to have enlarged the pleadings to allow the court to rule on such a claim. See Harris v. Cola, 98-0175 (La.App. 1st Cir.5/14/99), 732 So.2d 822, 825; Boudreaux v. Terrebonne Parish Police Jury, 477 So.2d 1235 (La.App. 1st Cir.1985), writ denied, 481 So.2d 133 (La.1986).
The evidence concerning B & A's participation in the opt-out cases had relevance for the issues being litigated between B & A and Kozak on the principal demand. It also had relevance for the trial court's determination of how much overall work was required to litigate and settle the opt-out cases, in order to determine the quantum meruit value of Kozak's contribution to the joint venture. Therefore, without the express consent of M & M, the admission of such evidence could not enlarge the pleadings to assert damages based on a wholly new cause of action against M & M for an alleged violation of Louisiana partnership law. Because the issue had not been joined between Kozak and M & M, the trial court did not err in failing to find a violation of Louisiana partnership or joint venture law as a result of M & M's agreement to pay B & A a portion of their joint attorney fees in the Baton Rouge opt-out cases.
However, even if we were to consider the court's silence on this issue as a denial of the claim on the merits, we find no error in that conclusion. Arceneaux testified that M & M contacted him in the mid-1990's for B & A's assistance with the AIDS-hemophiliac cases. B & A agreed to accept telephone calls from people who were seeking advice as to whether to opt-in or opt-out of the Chicago multi-district litigation and eventual settlement. Mull also asked Arceneaux to assist with its Louisiana cases that were pending in Orleans Parish. Because of B & A's expertise, knowledge of the cases, relationship with the clients, and familiarity with the Louisiana courts, the plaintiffs' team gradually sought B & A's assistance also in the non-Louisiana clients' cases that had been filed in Baton Rouge. Initially, B & A agreed to provide those services at the firm's hourly rates. As those fees began to mount,[15] the plaintiffs' team verbally *243 agreed to convert the obligation into a contingency fee interest for B & A.
When M & M and Kozak brought in the Baum, Hedlund and Bowers, Orr firms for professional and financial assistance with the representation of the opt-out clients, B & A was already extensively involved in the work. On September 29, 1997, Michael Baum of Baum, Hedlund wrote a letter to M & M, Kozak, and B & A, thanking them for the opportunity to work with them on the cases and outlining a fee agreement relative to their joint representation of the opt-out clients. Because the letter was intended merely to specify the percentage interests of the two new firms on the plaintiffs' team, it did not specify the fee division between M & M and Kozak or between Baum, Hedlund and Bower, Orr, nor did it address B & A's percentage interest. The letter simply provided that "Kozak/Mull & Mull" would receive a specified percentage of the fees, and confirmed that Kozak had no fee interest in the Louisiana cases. Nonetheless, the letter clearly implied that B & A and Kozak/Mull & Mull had an ongoing working relationship relative to the AIDS-hemophiliac cases. The September 29th letter agreement was signed by Baum, Kozak, Mull, Mrs. Mull, Arceneaux, and James Orr of Bowers, Orr. Kozak's signature on this document evidences his knowledge that the team of attorneys working on the opt-out cases already included B & A.
As previously discussed, Kozak later tried to renegotiate the September 29th agreement to obtain a share of the fees in the Louisiana cases in which he held no interest. By fax transmitted on August 3, 1998, Kozak proposed that the fee arrangement be modified so that all members of the plaintiffs' team, "Kozak, the Law Firm of Baum, Hedlund et al, Mull and Mull and Barham and Arceneaux," would share equally. The proposed "Revised Fee Agreement" was prepared by Kozak for signature by Baum, Arceneaux, Mull, and Kozak. Although his proposed revision did not include Bowers, Orr, Kozak subsequently acknowledged its involvement by demanding that each firm get one-fifth of the attorney fees derived from the Louisiana cases. This proposal from Kozak again indicates his recognition that B & A was already a full participant on the plaintiffs' team.
When Kozak did not succeed in obtaining a revised fee agreement that met with his approval, he reneged on his work assignments in the model case, took actions that were detrimental to all of the claimants represented by the plaintiffs' team, and tried to create dissension among the clients and members of the plaintiffs' team. Kozak had come to believe that AIDS in hemophiliacs was not caused by HIV, but by the presence of other substances in the blood products used for transfusion. Once he reached this conclusion, he focused all his efforts in this direction, rather than assisting with the trial strategy being developed by the team with the help of various scientific experts. Kozak's adherence to the "HIV does not cause AIDS" theory undermined the efforts of the plaintiffs' team to prepare for trial or settlement of the opt-out cases. His criticism of the plaintiffs' team was widely disseminated among the hemophiliac community on the internet, causing confusion and loss of confidence among the clients and providing ammunition that could be used by the defendants. It is clear from Kozak's own admissions that he performed little in furtherance of the opt-out cases after April 1999. The deterioration of Kozak's relationship with the other firms continued *244 until early 2000, when the plaintiffs' team learned that, in addition to urging his "HIV does not cause AIDS" theory, Kozak was soliciting clients to terminate their relationship with the rest of the plaintiffs' team and to be represented by him and a San Francisco law firm. It was due to these actions that Mull and Baum notified Kozak in the March 1, 2000 letter that their primary ethical duty to protect their clients' interests overrode any secondary duty owed to him as co-counsel. Mull and Baum advised Kozak that because of his actions, which they felt were adverse to the clients being represented by the plaintiffs' team, they would no longer need his assistance in the settlement negotiations or the prosecution of the Baton Rouge cases.
From the terms of the September 29th letter agreement and subsequent correspondence related to Kozak's attempts to have that agreement revised, it is apparent that Kozak and the other members of the plaintiffs' team thought of B & A as a full team member. Mull said that during the many months that Arceneaux worked on the opt-out cases that were pending in Baton Rouge, he performed a tremendous amount of work that was of impeccable quality. He conducted legal research, drafted all the pleadings and memoranda, maintained contact with the clients, and assisted in depositions. Kozak agreed that Arceneaux's work was "brilliant," expressed no objection to the role B & A played on the plaintiffs' team, and accepted the benefits from that work. Clearly, M & M did not admit a new partner when it recognized B & A's long-term participation in the joint venture and agreed to split the attorney fees from the Baton Rouge opt-out cases with B & A.
In the letter agreement of June 13, 2000, B & A was assigned ten percent of the attorney fees in the pending M & M and Baum, Hedlund cases, five percent of which was to come from M & M/Kozak's fee interest in those cases. This letter was prepared to be signed by Baum for Baum, Hedlund; Orr for Bowers, Orr; Mull and his wife for M & M; and Arceneaux for B & A. The letter did not mention Kozak, and he argues that this "unilateral" action by M & M violated his rights as a member of the joint venture. However, even before Baum, Hedlund and Bowers, Orr joined the plaintiffs' team, Kozak had recognized that B & A was entitled to share in the fee distributions. At that time, the only team members were B & A and M & M/Kozak. In order for B & A to actually get a portion of the fee, the other members would, of course, have to take a smaller share of the total. The June 13, 2000 letter agreement merely stated or memorialized a decision affecting the management or operations of the entire group. As such, unanimity was not required for the decision to be valid, but only the agreement of a majority of the members of the joint venture. See LSA-C.C. art. 2807.[16] Thus, Kozak's signature was not required prior to the payment of fees to B & A on the Baton Rouge cases pursuant to the June 13, 2000 agreement. We find no merit in Kozak's contention that this somehow constituted a violation of the joint venture agreement between him and M & M.

Apportionment of Fees between Kozak and M & M
Kozak asserts that the trial court's allocation of only fifteen percent on a quantum meruit basis, without objective recognition of his contributions, constituted *245 a travesty of justice when considering that courts have awarded similar amounts for mere referrals. After carefully evaluating the evidence, the trial court concluded that the overwhelming work and expense sharing was borne by M & M, while the work of Kozak was intermittent and inconsistent. According to the trial court, the work claimed to have been done by Kozak was not impressive and was overstated at best. After taking into account the amount and value of the work performed in connection with these cases through the dissolution of M & M and Kozak's relationship, the trial court found that M & M was entitled to eighty-five percent of the fee and Kozak to fifteen percent. Our review of the trial court's quantum meruit allocation of the contingency fee is subject to the manifest error standard of review. See Brown, 726 So.2d at 1023.
While Kozak asserts the trial court used no objective analysis in apportioning the attorney fees, the trial court's reasons for judgment indicate that it evaluated the evidence in light of the factors agreed on by the parties in their fee agreement and applied the appropriate standards. Furthermore, we note that the record amply supports a finding that the plaintiffs' team had stopped consulting with Kozak and that he had ceased taking any active role in the cases for an extended period of time prior to the settlement of these cases. After October 1998, when he balked at assisting with the model case in New Orleans, Kozak did virtually nothing that contributed to the team effort. Instead, after this time, Kozak's activities were directed toward proving the "HIV does not cause AIDS" theory and were more detrimental than helpful to the cause of the opt-out plaintiffs. After considering the evidence, we conclude the record supports the trial court's finding that, relative to their joint venture representing the opt-out clients, the overwhelming work and expense were borne by M & M. While this court might have apportioned fees differently, we find the trial court's apportionment of only fifteen percent of the fees to Kozak was reasonably supported by the record, and its determination in this respect was not clearly wrong.[17]

Breach of the Chicago Agreement
Relative to the opt-in clients, M & M argues that the trial court erred in failing to find that Kozak breached the Chicago Agreement, such that M & M would be entitled to damages arising from the breach. M & M claims those damages consist of the legal interest it was required to pay B & A on the legal fees awarded by the trial court. Judgment was rendered in favor of B & A and against M & M and Kozak, in solido, in the amount of $584,256.04, plus legal interest from the date of judicial demand until paid. The judgment also awarded M & M contribution from Kozak in the amount of one-half of the total amount due. The effect of this judgment is that M & M must pay one-half of the legal interest on the fees due to B & A.
An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance. LSA-C.C. art. 1994. When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, *246 at the rate of legal interest as fixed by Louisiana Civil Code article 2924. LSA-C.C. art. 2000.
M & M at no time disputed the legal fees owed by it to B & A. As soon as it received B & A's final accounting, M & M authorized the disbursement of attorney fees to B & A and the allocation of funds in accordance with the terms of the Chicago Agreement. Its portion of B & A's fee would have been timely paid except for the fact that Kozak opposed any such distribution from the fee fund. In addition, M & M paid $96,830 of the $106,977.12 that it alone owed to B & A for its services after November 1998 when Kozak terminated B & A. Kozak argues that M & M could have avoided accrual of legal interest on the attorney fees owed by both of them to B & A by paying the entire fee and then seeking reimbursement from Kozak for his portion of that fee. However, Kozak made no showing that M & M had the financial resources to make such a payment when, as a direct result of his actions, M & M's portion of the fees from the opt-in cases was being held in an escrow account with the PSC administrator in Chicago. Kozak's failure to authorize disbursement of the funds necessary to pay M & M's portion of B & A's legal fees constituted a breach of contract, which caused M & M to incur a liability to B & A that it otherwise would not have had. Accordingly, we conclude the trial court erred in failing to award M & M damages for Kozak's breach of the Chicago Agreement, in an amount equal to the legal interest M & M was required to pay on the legal fees jointly and solidarily owed to B & A.

Allocation of Costs
Kozak asserts that the trial court abused its discretion by allocating eighty percent of the costs to him and twenty percent to M & M. He contends both were defendants in the main demand brought by B & A; both were found liable in solido to B & A; M & M was unsuccessful on its cross-claims against Kozak; and M & M succeeded only in its request for a declaratory judgment on the issue of the quantum meruit division of their jointly-earned attorney fees.
The existence and terms of the Chicago Agreement were not disputed by M & M, but only by Kozak. M & M succeeded in having the trial court (1) uphold the Chicago Agreement regarding the sharing of fees in the opt-in cases, (2) grant its cross-claim against Kozak seeking contribution for 1/2 of the attorney fees owed to B & A through November 3, 1998, and (3) declare that Kozak was not entitled to an equal division of fees in the Baton Rouge opt-out cases, but rather an 85/15 quantum meruit allocation. The trial court dismissed only M & M's claims against Kozak for further reduction in his attorney fees due to breaches of their contractual relationships and for damages due to tortious interference with contract.
The party cast in judgment is generally taxed with costs; however, pursuant to Louisiana Code of Civil Procedure article 1920, the trial court has the discretion to assess costs of a suit in any equitable manner. On appellate review, only a showing of an abuse of discretion warrants a reversal of the trial court's cost allocation. Thibodeaux v. USAA Cas. Ins. Co., 93-2238 (La.App. 1st Cir.11/10/94), 647 So.2d 351, 362. We find no abuse of discretion in this case. The great majority of the costs were incurred solely because of Kozak's refusal to allow disbursement of funds from the fee fund to pay B & A for amounts owed by him and M & M. Although couched as a judgment against him and M & M, in reality, M & M had never opposed B & A's claim to its fee. Therefore, M & M was, in effect, the prevailing *247 party on this issue as well as on its cross-claim against Kozak for a quantum meruit division of their attorney fees from the opt-out cases. We find no abuse of discretion in the trial court's assessment of trial costs.

Decree
For the foregoing reasons, the judgment of the trial court is reversed insofar as it failed to award damages to Mull & Mull for Charles Kozak's breach of the Chicago Agreement. Otherwise, the judgment is affirmed. Judgment is rendered in favor of Mull & Mull on its cross-claim against Charles Kozak in an amount equal to the legal interest on $292,128.02, from the date of judicial demand by B & A until paid.[18] All costs of this appeal are assessed to Charles Kozak.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
NOTES
[1] Judge Ian W. Claiborne, retired from the Eighteenth Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] HIV is the acronym for Human Immunodeficiency Virus.
[3] AIDS is the acronym for Acquired Immune Deficiency Syndrome.
[4] Cross v. Cutter Biological, Div. of Miles, Inc., 94-1477 (La.App. 4th Cir.5/29/96), 676 So.2d 131, writ denied, 96-2220 (La.1/10/97), 685 So.2d 142.
[5] The record and briefs to this court are inconsistent concerning the number of opt-out cases filed in Baton Rouge. However, it is clear that in mid-1997, M & M and Kozak sought assistance with the opt-out cases from a California firm, Baum, Hedlund, Aristei, Guilford & Downey (Baum, Hedlund), and a South Carolina firm, Bowers, Orr & Dougall (Bowers, Orr); these firms agreed to advance the ongoing litigation costs. Kozak did not have any clients in the Orleans Parish cases, all of whom were M & M and/or Barham & Arceneaux (B & A) clients. B & A also assisted with the opt-out cases involving non-Louisiana residents, and later, the firm of deGravelles, Palmintier & Holthaus was also brought in as local counsel in the Baton Rouge cases.
[6] Kozak agreed with the model case strategy and initially was cooperative in providing assistance. But as the trial preparation increased, he began to demand a fee interest for his work on the Orleans Parish cases. By late October 1998, at a crucial time in the trial preparations when he was to depose a key defense expert, Kozak made his work contingent on getting a fee interest in these cases. He stopped providing any assistance and did not attend the trial of the model case. From this point on, the relationship between Kozak and the other members of the plaintiffs' team rapidly deteriorated. By late 1999, Kozak had tried to pull some of their mutual clients to other firms for representation, and in March 2000, M & M and the other attorneys on the plaintiffs' team agreed to disassociate Kozak from the cases they were jointly handling.
[7] See Smith v. Cutter Biological, 99-2068 (La.App. 4th Cir.9/6/00), 770 So.2d 392.
[8] M & M agreed to pay all of B & A's fees for services rendered after this date. In connection with the Chicago Agreement, M & M also agreed to assume a greater portion of the litigation costs and B & A agreed to rebate $50,000 of its fee to Kozak and $25,000 to M & M.
[9] On the official distribution documents, the PSC administrator showed this amount as $1,750,000 for fees and $200,000 for payment of costs. It also included $275,000 to M & M and $275,000 to Kozak for serving on the PSC during the early stages of the litigation. However, M & M and Kozak acknowledged in open court that their agreement to split the fees was based on the entire $2.5 million fund, irrespective of these internal allocations.
[10] Kozak first removed the case to the United States District Court for the Eastern District of Louisiana, New Orleans Division, and filed an answer, counterclaim, and amended counterclaim (reconventional demand) in that forum. The federal court remanded the case, and all the pleadings from the federal court were filed in globo in these proceedings as an exhibit.
[11] See Duer & Taylor v. Blanchard, Walker, O'Quin & Roberts, 354 So.2d 192, 194-95 (La. 1978).
[12] Mull testified that he was not present at the hearing, but he learned that Kozak had accused the PSC of ignoring the strategies recommended by Mull and Kozak, insisting on weaker theories of recovery, and colluding with the defendants to the detriment of the plaintiffs. Noting this "sharp difference of opinion" among the PSC attorneys, the court removed Mull and Kozak from the PSC.
[13] Their joint representation covered only non-Louisiana AIDS-hemophiliac clients; Kozak did not represent any of the Louisiana clients.
[14] M & M and Kozak together were considered a single member of the team, the other members being B & A, the Baum, Hedlund firm, the Bowers, Orr firm, and the deGravelles, Palmintier & Holthaus firm. Like M & M and Kozak, B & A had not reduced to writing its fee agreement with the other members of the plaintiffs' team. Arceneaux testified he believed his firm would be entitled to twenty percent of the contingency fees in the Baton Rouge opt-out cases. However, as new members had joined the plaintiffs' team, they did so pursuant to written fee agreements that did not leave a balance of twenty percent available for B & A. Under the June 2000 letter agreement, the plaintiffs' team agreed that B & A would be paid ten percent of the attorney fees from those cases.
[15] Arceneaux testified that B & A's hourly billings in the Baton Rouge cases early on exceeded $1 million.
[16] Decisions affecting the management or operation of a partnership must be made by a majority of the partners, but the parties may stipulate otherwise. LSA-C.C. art. 2807.
[17] Since the trial court's allocation of fees is undisturbed, we pretermit consideration of the alternative issues raised by M & M's assignments of error.
[18] $584,256.04 / 2 = $292,128.02.